Robert P. LEE et ux.

v.

William F. RAYMOND et ux.

No. 80–324–Appeal.

Supreme Court of Rhode Island.

Feb. 25, 1983.

Harold B. Soloveitzik, Westerly, for plaintiffs.

F. Albert Starr, Cranston, for defendants.

OPINION

KELLEHER, Justice.

Spirited cocktail parties, cordial dinners, and spontaneous card games are no longer frequent social activities indulged in togeth-

er by the Raymonds and the Lees. Such high-water marks of Block Island neighborliness vanished when the Lees filed suit to quiet title and enjoin the Raymonds from trespassing on certain property to which both parties claim ownership. The Raymonds bring this appeal from a judgment rendered by a justice of the Superior Court sitting without a jury, awarding title to the property by adverse possession to the Lees.

William F. Raymond and his wife Rachel and Robert P. Lee and his wife Margaret are owners of adjacent parcels of real estate in the town of New Shoreham, Rhode Island.[1] The Lees acquired title to their property in a deed from Norman V. Lamb, executed on August 20, 1956, in which the northern boundary is described as a drainage ditch. The Raymond property was acquired by Mrs. Raymond during a previous marriage pursuant to a deed executed on October 22, 1945, by the Verona Trust Company, executor of the estate of Louise D. Weir. That deed expressly provided that the property was bounded on the south by land of Joshua P. and Nancy R. Smith "or however otherwise the same may appear to be bounded it being the same premises conveyed to William A. Dunn by deed from Ella C. Dunn dated August 25, 1917 * * *." The Raymond property was similarly described in the deed from William A. Dunn to Robert W. and Louise Dodd Weir dated September 27, 1932. In the latter deed, however, the property was further described on a map attached to and made a part of the deed. The map indicated that the southern boundary of the Raymond property was a stone wall that also served as the northern boundary of the property belonging to Joshua P. Smith, a predecessor in title to the Lee property.

The land in dispute (parcel or field) is located between the drainage ditch cited in the Lamb deed and the stone wall illustrated on the map accompanying the Dunn deed.[2] The Lees maintain that their property's northern boundary ends at the drainage ditch, whereas the Raymonds allege that the Lees' northern boundary ends at the stone wall, a considerable distance short of the drainage ditch. The parcel comprises approximately 1.3 acres of open field that is bordered on the east by a small pond known as Ames Tug Hole Pond.

In support of their claim that they owned the parcel outright by deed or, alternately, under the doctrine of adverse possession, members of the Lee family testified to the following details. Mr. Lee stated that prior to obtaining his deed from Norman Lamb in 1956, he and his son, Hugh, walked the boundaries of the land with Lamb. At that time, Lamb allegedly indicated to the Lees that the northern boundary of the parcel that he intended to convey to them consisted of the drainage ditch and a stone wall that ran tangentially and extended in a rough line from the ditch to the pond.

The Lees observed that the land between the stone wall in issue and the drainage ditch was overgrown with brush and that the ditch itself was covered by briars. They also noticed that no passageway existed over the ditch or through the tangential wall except for two or three logs that would permit crossing by an "agile person." In reliance upon these observations in conjunction with Lamb's statement, Lee concluded that the drainage ditch formed a natural boundary. He consequently deemed it unnecessary to have the land surveyed or the title searched.

Beginning in 1958, Lee had the field cleared of brush by Robert Rice, a local handyman. Thereafter, it was cleared every two or three years until the institution of this litigation. During that period, the Lees used the parcel mainly for recreational purposes in the summer months. For several summers they lived in a tent; they later moved into a garage equipped with a privy before eventually constructing a house and taking up permanent residence in the town in 1972.

1. New Shoreham is also known as Block Island.

2. See Appendix.

In 1964, Lee conveyed an easement to the New England Telephone Company and the Island Light and Power Company running through the field to the drainage ditch. In 1966, Lee once again hired Robert Rice and this time had him build a road that wound its way from the southern boundary of the Lee property through the parcel so that vehicles could cross the drainage ditch. After the road was constructed, Lee allegedly gave permission to the Raymonds to use the road and to keep it clear of brush and undergrowth. Another neighbor who paid for a culvert over the ditch was also granted permission to traverse the road.

Lee's daughter, Isyla, explained that from the time her parents first purchased the parcel in 1956, she and her brother Hugh spent many hours there picking berries, riding horses, driving their jeep, and fishing or boating on the pond. Hugh had regularly cut paths to the pond where he and his father built a floating dock to moor the family boat. Isyla also noted that she and Hugh occasionally asked strangers who strayed onto the field to leave. For his part, Hugh stated that no one ever objected to his clearing brush from the area and that he never observed anyone else cutting paths through the field. Additionally, he echoed his father's testimony concerning the absence of any kind of bridge over the drainage ditch except for two or three logs lying precariously across its edges.

Mrs. Lee basically corroborated the testimony of her husband and children, and Robert Rice substantiated the Lee family's testimony concerning the work he had performed for them. For purposes of this appeal, it is significant that Rice's testimony indicates that in his dealings with the Lees, they always conducted themselves in a manner consistent with ownership of the property. For example, although a neighbor paid for the installation of the culvert over the ditch, it was charged to Lee and installed at his direction. Furthermore, on the occasions that Rice worked for the Lees, he emphasized that he never observed the Raymonds on the field.

After hearing the accounts given by the Lee family, the Raymonds had different stories to tell. Mrs. Raymond testified that her grantor, Louise Weir, maintained a vegetable garden on the southerly side of the drainage ditch, which is the area to which both parties are claiming title. Upon purchasing the property in 1945, Mrs. Raymond continued to cultivate the garden for five years. To gain access to the garden, Mrs. Raymond used two footbridges with handrails that she said spanned the drainage ditch at that time. Apparently, the bridges were substantial enough to support the weight of oxen that crossed over the ditch to plow the garden. However, in 1950, Mrs. Raymond's agricultural enthusiasms subsided, and she let the field go to brush "for the purpose of wildlife and birds." From that time forward her use of the parcel was limited to using it as a footpath to neighbors' homes for social visits. She insisted though that it was her husband, and not the Lees, who maintained the property by periodically cutting back the brush to control overgrowth.

Mr. Raymond also testified, but his observations are circumscribed by the fact that his regular summer visits to Block Island did not begin until 1966, ten years after the Lees purchased their property. In contrast to the Lees' statements concerning their frequent clearing of brush from the land, Raymond maintained that he was aware of only one such occasion when the Lees performed this task. Yet, although his wife believed that he had regularly cleared brush from the field, Raymond's memory was that he had not even attempted to do so prior to 1976. He did, however, keep the areas adjacent to the road built by the Lees cleared but denied ever first obtaining their permission.

Raymond admitted that he had observed Hugh Lee in the field cutting paths, driving his jeep, and helping his father construct the dock, but he had neither objected to these actions nor thought it necessary to give the Lees his express permission to engage in them. Furthermore, in 1968, he too

granted an easement to the New England Telephone Company and the Island Light and Power Company. However, his easement, unlike the Lees', started at some point "near the drainage ditch" and then ran in a northerly direction through the Raymond property away from the disputed field. Finally, Raymond too mentioned that he and his wife walked through the field on occasion to visit neighbors.

The controversy in issue between the parties arose in 1975 when the Lees entered into an agreement with the Rhode Island Department of Natural Resources to provide a wildlife feed area on the parcel in exchange for their tilling and seeding of the land. When the state agent attempted to clear brush from the area, one of the Raymonds informed him that he was trespassing on their land and that he must vacate the premises. Unable to come to terms with the Raymonds, the Lees brought this action in the Superior Court; the Raymonds responded by filing a counterclaim.

After reviewing the evidence presented at trial, the trial justice concluded that based upon his reading of the deeds, his determination was that the border separating the two properties was in fact the stone wall and not the drainage ditch. However, he ruled that the testimony and exhibits clearly established that the Lees had subsequently acquired title to the field by adverse possession. He specifically found that the Lees met their burden of proof "by a preponderance of the clear and positive evidence" and that their possession of the land was "actual, open, notorious, hostile, under claim of right, continuous and exclusive."

In challenging this action, the Raymonds do not contest the trial justice's finding that their deed established the stone wall as the southerly boundary line of their property. Their appeal rests on an allegation that the trial justice erred as a matter of law in concluding that the Lees obtained title to the field by adverse possession. They further contend that the factual findings of the trial justice were clearly wrong or were based upon an oversight or misconception of material evidence.

The statutory period for establishing title by adverse possession in Rhode Island is ten years. During that time, the claimant must be "in the uninterrupted, quiet, peaceful and actual seisin and possession of [the land] * * *." General Laws 1956 (1969 Reenactment) § 34–7–1. The cases unequivocally indicate that the adverse nature of the possession must be actual, open, notorious, hostile, under claim of right, continuous, and exclusive. *Gammons v. Caswell,* R.I., 447 A.2d 361, 366–67 (1982); *Taffinder v. Thomas,* 119 R.I. 545, 551, 381 A.2d 519, 522 (1977). We have interpreted these requirements on numerous occasions and consequently shall only briefly discuss them here.

We first note that claimants in adverse-possession cases must establish each of the elements of possession discussed below by a preponderance of clear and convincing evidence. *Gammons v. Caswell,* R.I., 447 A.2d at 366; *Russo v. Stearns Farms Realty, Inc.,* 117 R.I. 387, 391, 367 A.2d 714, 716–17 (1977). The elements of "exclusivity" and "claim of right" were most recently addressed in *Gammons, supra.* There, we affirmed the finding of the trial justice that the Gammonses had acquired title by adverse possession to a disputed parcel of real estate bordering property to which they were the record owners. They believed, according to their deed, that the property extended through the disputed area to a granite marker and privet hedge. Consequently, they cared for the property by removing underbrush, pruning, and cultivating. *Gammons v. Caswell,* R.I., 447 A.2d at 363. On the other hand, the defendants failed to show that they had made any use of the property in any way similar to that of the Gammonses. We concluded that "[i]n order to find that the property was not used exclusively by the Gammons[es], there would have to be evidence indicating that the defendants or others had made improvements to the land or, at the very least, had used the land in a more significant fashion than merely walking across it." *Id.,* 447 A.2d at 368.

In *Gammons* we also addressed the element of "openness" as a required element of adverse possession. We stated that no particular act to establish an intention to claim ownership is required to give notice to the world of the claim. It is sufficient for the claimant to go upon the disputed land and use it adversely to the true owner. The owner then becomes chargeable with knowledge of whatever occurs on the land in an open manner. *Id.,* 447 A.2d at 367 (citing *Greenwood v. Rahill,* R.I., 412 A.2d 228 (1980)); *Sherman v. Goloskie,* 95 R.I. 457, 188 A.2d 79 (1963).

With regard to the element of "hostility," we adopted the rule that once a determination is made that the possession of the claimant is to a visible line, his possession is hostile regardless of the location of the true boundary line. *LaFreniere v. Sprague,* 108 R.I. 43, 50, 271 A.2d 819, 822 (1970). More recently in *Taffinder v. Thomas,* 119 R.I. at 552, 381 A.2d at 523, we held that the term "hostile" does not connote a communicated emotion but, rather, action inconsistent with the claims of others. A person is a hostile occupant of the land when he mistakes his boundary but continuously asserts dominion over the property for the statutory period.

■ Finally, with respect to the elements of "actual" and "continuous" possession, constant use is not required when the property is of such character as to preclude actual occupation. "[T]he test is whether the use to which the land has been put is similar to that which would ordinarily be made of like land by the owners thereof." *Russo v. Stearns Farms Realty, Inc.,* 117 R.I. at 392, 367 A.2d at 717. Additionally, the continuity of the possession must be sufficient to signal the true owner of the land that a claim of title contrary to his own is being asserted. *Sherman v. Goloskie,* 95 R.I. at 465, 188 A.2d at 83.

■ In the instant case, the Lees possessed the property in question under a mistaken claim of right based upon the deed from Norman Lamb. The record establishes that this claim was reinforced by their own observations and by Lamb's designation of the boundary lines when they walked the land with him prior to its purchase in 1956. The Lees used the parcel openly and exclusively without interference from the Raymonds for a period of nineteen years. As previously discussed, the Lees used the field for recreational purposes, employed a handyman to build a road across it, and granted an easement through it to the power and the telephone companies. Furthermore, they regularly cleared the field of brush and permitted the state to cultivate it in 1975. Acts strikingly similar to these in *Gammons v. Caswell,* R.I., 447 A.2d 361 (1982), were deemed sufficient to establish title by adverse possession.

■ The Raymonds cannot complain that the Lees' possession did not become open until 1975 when the state attempted to cultivate the land because they are chargeable with knowledge of what was happening on the property. *Id.,* 447 A.2d at 367. In fact, the Raymonds admitted that they were aware of many of the uses to which the Lees were putting the field but never objected. In our opinion, these various uses of the land, which the Lees claimed as their own to the "visible line" of the drainage ditch, were affirmative acts constituting notice to the Raymonds that the Lees' occupancy was hostile to them.

■ Turning to the elements of actual and continuous possession, we note that for much of the statutory period, the Lees lived in a tent and garage adjacent to the field. Their presence on the property during the summer months only in no way undermines their claim of title under the doctrine of adverse possession. Year-round occupation is not required to prove actual and continuous possession. *See Sherman v. Goloskie,* 95 R.I. 457, 188 A.2d 79 (1963). The Lees met their burden of proof by treating the parcel as summer property, which the record indicates is consistent with the uses ordinarily made of similar property owned by many other proprietors on Block Island.

During the statutory period, the Raymonds, unlike the Lees, neither improved the parcel nor made any use of it other than to pass through it to visit neighbors on social calls, as is the custom on Block Island. As previously noted in *Gammons v. Caswell,* R.I., 447 A.2d at 368, something more than mere walking on the land is required either to establish dominion over it or to challenge another's claim of right. The bridges, oxen, and garden were abandoned in 1950, six years prior to the Lees' purchase, and no attempt to clear the field of brush was made until 1976, one year after suit was filed to quiet title. Finally, the fact that an easement was granted to the phone and the power companies by the Raymonds does not constitute an exercise of dominion over the parcel because it only skirted the disputed boundary line.

This court has previously ruled that the trial justice's conclusions of law, if correct, will be affirmed. *Altieri v. Dolan,* R.I., 423 A.2d 482, 484 (1980). Relying on the record and the foregoing discussion, we find that the trial justice correctly concluded as a matter of law that the Lees established each of the elements of adverse possession by a preponderance of clear and convincing evidence.

▮ The Raymonds' secondary allegation challenges the factual findings upon which the trial justice based his conclusion that the Lees had acquired the property by adverse possession. In the instant case, many of the findings of the trial justice were by necessity based upon the credibility of the witnesses. The standard of review to be applied under such circumstances is well settled in Rhode Island. The findings of fact of a trial justice, sitting without a jury, will be given great weight and will not be disturbed on appeal unless such findings are clearly wrong or the trial justice misconceived or overlooked material evidence. *Gammons v. Caswell,* R.I., 447 A.2d at 366. This policy is equally applicable to cases involving claims of adverse possession. *Id.*

▮ Furthermore, decisions of a trial justice on questions of credibility carry great weight because of the advantage he had in seeing and hearing the witnesses as they testified. Unless the transcript clearly discloses that the trial justice was mistaken in his judgment of the credibility of the witnesses, we shall not disturb his decision. *Ducharme v. Champagne,* 110 R.I. 270, 273, 292 A.2d 224, 225 (1972). After reviewing the record in the light of the evidence that the trial justice found credible, we cannot say that his conclusions are clearly wrong or that he misconceived material facts.

In his decision, the trial justice summarized the testimony of each of the witnesses. He was cognizant of the testimonial conflicts regarding the existence of bridges over the drainage ditch, the clearing of brush from the land, the volume of use of the property made by the parties, and the allegations concerning who granted whom permission to use the property. He found it significant that Mr. Lee's testimony was corroborated by Robert Rice and other members of the Lee family whereas Mrs. Raymond's testimony was at times contradicted by her husband. Bearing these inconsistencies in mind, the trial justice made the following finding:

> "[A]fter going over all of the testimony which was elicited from the various witnesses who testified during the course of the trial, and after going over all of the tangible exhibits which [were] introduced into evidence, reading them, weighing them, that the plaintiffs [had], in fact, acquired title to the disputed area by adverse possession."

Accordingly, we affirm the finding of the trial justice that the Lees were owners of the property by virtue of adverse possession. However, there are two apparent factual errors in the judgment order entered April 29, 1980, which must be corrected. In the order, the northern boundary of the Lee property is described as "the center line of said [drainage] ditch to a pond entitled, 'Ames Tug Hollow Pond.'" The record

clearly establishes that a short stone wall intervenes between the drainage ditch and the pond, which is actually named Ames Tug *Hole* Pond. Furthermore, the Lees have conceded that the wedge-shaped piece of property bordered by the pond, the drainage ditch, and the stone wall does not belong to them. Consequently, the order of April 29, 1980, describing said northern boundary line must be modified in line with the concession made by the Lees.

The appeal is denied and dismissed, and the case is remanded to the Superior Court with directions that the decree be modified to reflect the Lees' concession and the pond's correct name.

APPENDIX

Shaded area conceded by the Lees.

Map not drawn to scale.