**James T. WALSH**

v.

**Joseph R. CAPPUCCIO, Jr., et al.**

**No. 90–434–Appeal.**

Supreme Court of Rhode Island.

Jan. 29, 1992.

James H. Reilly, Kelly, Kelleher, Reilly & Simpson, Providence, for plaintiff.

James V. Auckerman, Kenyon & Auckerman, Wakefield, Nancy Dodge, Chernick & Dodge, Westerly, for defendant.

## OPINION

SHEA, Justice.

This matter comes before the Supreme Court on the defendant's appeal from a judgment in favor of the plaintiff. We affirm in part and reverse in part.

The plaintiff, James T. Walsh (Walsh), filed this civil action against defendants, Joseph Cappuccio, Jr., and his wife Marion H. Cappuccio (Cappuccios) in the Washington County Superior Court on May 30, 1986. The complaint alleged that Walsh owned, through adverse possession, a portion of lot No. 305 on the Pettaquamscutt Lake Shores plat in the town of Narragansett, Rhode Island. At that time the Cappuccios were the recorded owners of lot No. 305 and Walsh was the recorded owner of adjacent lot No. 304. In 1989, by consent, the Cappuccios were awarded summary judgment for the southwesterly triangular portion of lot No. 305 because Walsh did not claim to have taken it by adverse possession.

A nonjury trial commenced on April 9, 1990, regarding the northeasterly triangular portion of lot No. 305. After hearing the evidence presented by both parties, the trial court found that Walsh had acquired by adverse possession title to the northeasterly triangular portion of lot No. 305.

Judgment was entered for Walsh on April 20, 1990, and the Cappuccios filed the within appeal. The Cappuccios' third-party complaint for indemnification from the grantor of lot No. 305 was severed by agreement and is not the subject of this appeal.

The evidence presented at trial showed that in 1973 Edward Fortune (Fortune) bought lot No. 304 on the Pettaquamscutt Lake Shores plat in the town of Narragansett. Fortune cleared what he thought to be his lot in such a fashion that the eastern

and western boundary lines were perpendicular to Winterberry Road. Although Fortune believed that the rear boundary of his lot was marked by a stone wall he ceased clearing of the lot approximately fifteen feet in front of that stone wall. Fortune built a house on the cleared lot. He installed a septic system in the back yard and constructed a gravel driveway at the front of the lot that ran alongside the apparent western boundary.

Fortune and his family lived on the property for four to five years. The property was then sold to the Koudelas family who in turn rented the property to a family by the name of Mills. Mrs. Mills planted a garden along the western property-boundary line in the back yard of the property. The Mills maintained the yard as it had been originally cleared by Fortune.

In September of 1979 Walsh purchased the property from the Koudelas. At trial Walsh testified that he had inspected the house and lot before he purchased the property. The real estate agent told Walsh that the western boundary was marked by a line of rocks and that the property extended back to the stone wall. From September of 1979 to August 1980 Walsh lived on the property. On a regular basis he cut the grass to the apparent boundary lines established by Fortune years earlier. Walsh testified that he regularly dumped grass clippings and yard debris in the uncleared portion of the lot in front of the stone wall. He also testified that he used a path through the rear of the lot to take walks in the woods on the other side of the stone wall.

From August of 1980 through July 1985 Walsh leased the property to a series of tenants. A neighbor named James Duff testified that the tenants continued to cut the lawn up to the apparent boundary lines and used the driveway along the apparent western boundary line. During those years an underground drainage pipe was run from the house across the western portion of the side yard and past the western boundary line. Additionally a clogged pipe that ran from the house to the septic-system distribution box was replaced.

In August of 1985 Walsh moved back into the house. He trimmed back several trees and continued cutting the grass up to the apparent western boundary line. The grass cuttings and the yard debris were dumped in the uncleared area in front of the stone wall.

The Cappuccios purchased recorded lot No. 305 in October of 1985. In early 1986 they had the lot surveyed in preparation for the construction of their home. The survey revealed that the platted lots were laid out at a 57-degree angle to the road, not at a perpendicular angle as Fortune had assumed before clearing lot No. 304 to build his home. Because of Fortune's mistake a portion of Walsh's home, most of the rear yard—including Walsh's septic system—encroached on a substantial portion of the Cappuccios' lot. This encroachment has divided lot No. 305, a rectangularly shaped parcel, into two triangles of similar size. The northeastern triangular portion of lot No. 305 is the area wherein a portion of Walsh's home and rear yard is located. The uncleared area in front of the stone wall is at the northernmost portion of the triangular area in controversy.

Walsh sought and obtained a temporary restraining order prohibiting construction on lot No. 305 because the Cappuccios had obtained a building permit and planned to go forward with construction of a house. At trial Walsh characterized the fifteen-foot uncleared area in front of the stone wall as a "buffer zone."

The only issue before the court is, whether the trial court erred when it determined that Walsh acquired title to the entire northeastern triangular portion of the Cappuccios' property through adverse possession.

The Cappuccios contend that Walsh did not obtain title through adverse possession to the entire triangular shaped area in controversy because (1) he had no color of title to lot No. 305; (2) he did not intend to adversely possess lot No. 305; and (3) he actually possessed only a portion of the area in controversy. Additionally the Cappuccios assert that Walsh cannot establish ownership by adverse possession of the

uncleared portion of lot No. 305, in front of the stone wall, merely by alleging that the area was used as a "buffer zone."

Walsh argues that the law sustains the trial court's conclusion that he acquired title to the triangularly shaped area by adverse possession. He contends that although use of the "buffer zone" was intermittent, it was nevertheless continuous because the use was similar to that which would ordinarily be made of like land.

Establishing title to real property by way of adverse possession is a statutorily created right in Rhode Island. General Laws 1956 (1984 Reenactment) § 34-7-1 states the following:

> "Where any person or persons, or others from whom he or they derive their title, either by themselves, tenants or lessees, shall have been for the space of ten (10) years in the uninterrupted, quiet, peaceful and actual seisin and possession of any lands, tenements or hereditaments for and during such time, claiming the same as his, her or their proper, sole and rightful estate in fee simple, such actual seisin and possession shall be allowed to give and make a good and rightful title to such person or persons, their heirs and assigns forever; and any plaintiff suing for the recovery of any such lands may rely upon such possession as conclusive title thereto, and this chapter being pleaded in bar to any action that shall be brought for such lands, tenements or hereditaments, and such actual seisin and possession being duly proved, shall be allowed to be good, valid and effectual in law for barring such action."

The case law in Rhode Island is well settled; the adverse nature of the possession must be actual, open, notorious, hostile, under claim of right, continuous, and exclusive. *Lee v. Raymond*, 456 A.2d 1179, 1182 (R.I.1983). In order to succeed with a claim of adverse possession, the claimant must establish each of the above elements by a preponderance of clear and convincing evidence. *Id.; Gammons v. Caswell*, 447 A.2d 361, 366 (R.I.1982).

The findings of adverse possession by a trial court sitting without a jury are entitled to great weight and will not be overturned unless the factual finding is clearly wrong or unless the trial court overlooked or misconceived material evidence. *Hilley v. Simmler*, 463 A.2d 1302, 1304 (R.I.1983); *Lee v. Raymond*, 456 A.2d at 1184. Inasmuch as there is no dispute concerning the facts in the present case, our review is limited to whether the trial court was clearly wrong.

In the case before us evidence presented at trial showed that in 1973 Fortune began clearing what he thought to be lot No. 304 of trees and brush. By the time he completed the task, Fortune had established clear eastern and western boundary lines running in a northerly direction from Winterberry Road and ending approximately ten to fifteen feet south of a stone wall that is parallel to and north of Winterberry Road. The eastern and western boundary lines ran perpendicularly to Winterberry Road. On this cleared area Fortune erected a home, installed a septic system in the center of the back yard, planted a lawn that extended to the boundary lines, and made a driveway that lies adjacent to the western boundary line.

The evidence presented at trial unequivocally showed that during the period 1973 through 1985 Fortune, his successors in title, and their tenants lived on and maintained the area originally cleared by Fortune. In regard to the cleared area, without question the adverse nature of the possession was actual, open, notorious, hostile, under claim of right, continuous, and exclusive for a period of ten years. Relying on the record and the foregoing discussion, we find that the trial court correctly concluded that as a matter of law Walsh established each of the elements of adverse possession by a preponderance of clear and convincing evidence.

As for the buffer zone, the mere fact that Walsh used the uncleared area as a dump and occasionally crossed it to gain access to woods to the north of the stone wall in no way warrants a finding by the trial court that the elements of "exclusivity," "claim of right," "openness," or "hos-

tility" have been established by a preponderance of clear and convincing evidence. In numerous cases we have commented that "with respect to the elements of 'actual' and 'continuous' possession constant use is not required when the property is of such character as to preclude actual occupation." *Lee v. Raymond,* 456 A.2d at 1183; *Russo v. Stearns Farms Realty, Inc.,* 117 R.I. 387, 392, 367 A.2d 714, 717 (1977). However, we have long tempered that philosophy with the requisite that "continuity of the possession must be sufficient to signal the true owner of the land that a claim of title contrary to his own is being asserted." *Lee v. Raymond,* 456 A.2d at 1183 (citing *Sherman v. Goloskie,* 95 R.I. 457, 465, 188 A.2d 79, 83 (1963)). Here, unlike the cleared portion of lot No. 305, we find that the continuity of possession was not sufficient to signal the true owner of lot No. 305 that a contrary claim of title was being asserted. Therefore, we find that the trial court was clearly wrong when it found as a matter of law that Walsh had established by a preponderance of clear and convincing evidence title to the buffer zone by adverse possession.

For all these reasons the Cappuccios' appeal is granted in part and denied in part, the judgment appealed from is vacated, and the papers of the case are remanded to the Superior Court for entry of a judgment consistent with this opinion.