Quentin ANTHONY

v.

Donald SEARLE.

No. 92–572–Appeal.

Supreme Court of Rhode Island.

Aug. 1, 1996.

MaryJo Carr, Newport, for Plaintiff.

Steve Conti, Providence, for Defendant.

## OPINION

BOURCIER, Justice.

This case comes here on appeals filed by both the plaintiff and the defendant in an adverse possession boundary line dispute case. A Superior Court trial justice, sitting without a jury, found in favor of the plaintiff. The defendant, prior to entry of final judgment, appealed. The case was remanded from this Court to the Superior Court for entry of final judgment. The plaintiff, after entry of that final judgment, then proceeded to file a motion for a new trial. That motion was denied, and the plaintiff then filed his appeal. For the reasons hereinafter set forth, we affirm the trial justice's findings and the final judgment entered thereon.

I

### Case Travel—Facts

These appeals from the Newport County Superior Court sprout from a small slice of land in Jamestown on which were nurtured at various times a strawberry patch, a rabbit hutch, a tomato garden, a seedling sanctuary, and a multitextured lawn. The tranquillity envisioned by that serene setting was, however, unfortunately shattered by conflicting claims of ownership by the abutting neighbors, one of whom decided to invade and occupy the pastoral site in order to construct a foundation for an intended garage.

Quentin Anthony (Anthony), the plaintiff below, and Donald Searle (Searle), the defendant below, own abutting properties on Bay View Drive in the town of Jamestown. Anthony owns lot No. 739 on assessor's plat No. 8, and Searle owns lot No. 583 on the same plat. Searle purchased his lot in December 1980,[1] and Anthony purchased his lot on May 21, 1981. Searle's property is designated as 109 Bay View Drive and Anthony's as 105 Bay View Drive.

At trial in the Superior Court Anthony testified that although he and his wife, who was not a party in this litigation, took title to the 105 Bay View Drive property on May 21, 1981, the former owners had given him a key to the house and "free run of the property" in March of 1981. He testified that beginning at that time he did a significant amount of yard work on the property, such as mowing, fertilizing, and liming the lawn. Not having had a formal lot survey performed, he undertook to personally establish the northern boundary of his new property by what he perceived as being a "visible boundary line." He testified that although the property he purchased contained a "relatively well maintained yard," the adjoining property to the north, the Searle property, "was not a well maintained lawn." He testified that believing he had properly and correctly set his "line of occupation," he thereafter from at least May 1981 planted and maintained grass thereon, and proceeded to cut brush on the land, to cultivate and turn over the soil in preparation for future gardens and other plantings, and to dump grass clippings and cow manure thereon in anticipation of the future utilization of his geoponic skills as a horticultural and floricultural expert, an adjunct apparently to his skill as a boundary line surveyor. He testified that during the spring and summer of 1981 he actually did manage to grow a crop of tomatoes, some of which he gave to his neighbors.[2]

Anthony also testified that at times during the years 1981–1991, he had in addition to his tomato plantings planted a strawberry patch, constructed a rabbit hutch for his rabbits, and had grown trees and flowers from seedlings. In order to protect those seedlings, he had constructed two "cold frames" which were storm doors covered with plastic polyethylene, each about five feet by four feet in dimension. The rabbit hutch he maintained on the disputed property was erected atop several so-called sawhorses in the northwest

---

1. The record reveals that Searle's parents, Herbert and Katherine Searle, have served as caretakers of their son's property since it was purchased by Donald Searle in December 1980.

2. Anthony testified that he remembered having had tomatoes in the summer of 1981 and that as an accomplished gardener he must have planted the tomatoes by May or June because the plants require a certain amount of time in order to bear fruit.

corner of the property in question, and he tended to the rabbits he kept there on a daily basis with but one or two exceptions. There can of course be no question, as noted by the trial justice, that Anthony's occupation of the disputed slice of land was under belief of ownership and was clearly open and notorious for all, including the Searles, to see.

Sometime in late July 1991 the cow manure that Anthony had worked into the soil of the disputed border line was blown about by the foreboding winds of battle into the proverbial fan. At that time, Searle's parents, who were taking care of the property for him, decided to build a garage upon what they believed to be their son's land. That belief had been bolstered by a professional land survey that they had obtained from a local registered land surveyor. With more force than finesse, however, and failing to heed the wisdom of Cardozo who long ago said that justice is not to be taken by storm but instead to be wooed by slow advances,[3] they engaged the services of such heavyweights as a bulldozer and a backhoe to invade and recapture from Anthony what they believed to be their son's conquered slice of land.

On July 31, 1991, Anthony left home as usual and went to work. At work he received a call from his children advising that a bulldozer had been in their backyard, had driven over the area that he had cultivated, and had bulldozed "into a great big pile" the results of a decade of his agrarian talent and work. To add insult, but no injury, the workers engaged in the bulldozing had kindheartedly removed the rabbit hutch. Anthony left his place of work and returned to view the invasion by his neighbor's mechanized forces, and was there greeted by Searle's father, Herbert, who told him that he had obtained a land survey and that Anthony "was on his [Searle's] land." Two days later, on August 2, 1991, Anthony witnessed another attack upon his pastoral site, this time by a backhoe, which had commenced excavation for a garage foundation extending onto the slice of land in dispute. Quicker than the concrete could be poured, Anthony's attorney was in the Newport Superior Court that same day with a request for injunctive relief as well as for an award of treble damages and attorney's fees. A temporary restraining order was issued that day, bringing the hostilities to a cease fire. On August 7, 1991, Searle filed his answer to Anthony's complaint and, in friendly neighborly fashion, added to that response by filing a counterclaim alleging that Anthony was trespassing upon his property and committing waste thereon. Searle, not to be outdone by Anthony's initial salvo and expression of friendship, also requested injunctive relief as well as treble damages and attorney's fees.

## II

### The Procedural Questions

■ This case was reached for trial in July 1992. A Superior Court trial justice sitting without a jury heard testimony from witnesses who included Anthony, whose testimony is synopsized above, Searle's father and mother, who had taken up residence at their son's 109 Bay View Drive address, as well as from experts in land surveying, landscaping, and photogrammetry.[4] Upon completion of the presentation of that trial testimony and the admission of maps and other documentary exhibits, the trial justice found that Anthony had shown "by a preponderance of clear and convincing evidence" that he was entitled to the land to which he had tended since March of 1981, as he had "acted as the true owner to the visible boundary line." In addition to his finding that Anthony had established title by adverse possession, the trial justice further found that a surveyor was to be engaged by Anthony in order to "establish a line along the northerly line of his property adjacent to the defendant's property." This line was ordered to be in conformance with the "lawn texture transition line" as depicted on Searle's exhibit R, which had been pre-

---

3. Benjamin N. Cardozo, *The Growth of the Law*, 133 (1924).

4. Photogrammetry is the process of making surveys and maps through the use of photographs, especially aerial photographs—as was done by the experts in this case.

pared by a registered land surveyor.[5] The trial justice further ordered that "said line shall run in a westerly direction from Bay View Drive to a marker designating the southwest corner of the defendant's property and the northwest corner of the plaintiff's property. This disputed area, being an elongated wedge of land, is to be determined by metes and bounds by the registered land surveyor."

With regard to Anthony's request for damages, the trial justice declined to make any award, determining that there were "insufficient facts" upon which to base a finding and an award. Searle's counterclaim was denied and dismissed.

The trial justice's findings and decision, however, did not bring about an armistice. The litigation had not yet come to an end. The travel of the posttrial procedures in the case reveals why the trial justice referred to them as constituting "a procedural nightmare." Searle filed a notice of appeal on August 13, 1992, and on November 12, 1992, the case was certified to this Court. The case file contains a judgment that was stamped by a Superior Court clerk, but the judgment was in fact never actually entered. Then, on February 23, 1993, plaintiff Anthony filed a motion for a new trial, pursuant to Rule 59 of the Superior Court Rules of Civil Procedure, requesting that the trial justice amend his findings of fact and conclusions of law contained in his decision. Anthony specifically alleged that although the trial justice had correctly determined that a portion of the Searle land had been acquired by him through adverse possession, he incorrectly ordered that the "lawn transition texture line" be used as the demarcator between the two properties. Anthony hungered for, and believed he was entitled to, a bigger slice of the Searle property pie.

This Court, on April 22, 1993, remanded the case to the Superior Court for proper entry of final judgment. We further ordered that the prematurely filed appeal would be treated as having been taken from the final judgment when entered. The parties then filed a stipulation in the Superior Court on June 30, 1993, which stated that the entry of judgment would be treated as having been entered on June 30, 1993. There was no signed judgment bearing that date. It was not until July 9, 1993, that the trial justice was presented with, and signed, the proper final judgment, which was entered on July 12, 1993. That judgment, incorporating the trial justice's July 31, 1992 decision, described the adversely possessed land as follows:

"BEGINNING at a point in the westerly line of Bay View [D]rive, which said point is marked by a stake in the ground and which point marks the northeasterly corner of land of Quentin Anthony, known as Lot no. 739 on Jamestown Tax Assessor's Plat No. 8; thence running in a general westerly direction along the northerly boundary line of said land of Quentin Anthony for a distance of two hundred and two and forty-two one-hundredths (202.42) feet, to a point marked by a pipe in the ground and which said point marks the northwesterly corner of said land of Anthony; thence turning and running in a general northerly direction for a distance of ten and sixty-three-hundredths (10.63) feet to a point in the westerly boundary line of land now or formerly of Donald Searle, being Lot No. 583 on said Jamestown Tax Assessor's Plat No. 8; thence turning and running in a general southeasterly direction for a distance of two hundred one and thirty-three-hundredths (201.33) feet to the point or place of beginning in said westerly line of Bay View Drive, said last-mentioned forming an anterior angle with said first-mentioned course of 3 00' 00"."

Anthony then filed a second motion for a new trial on July 19, 1993, which necessitated yet another motion by the plaintiff requesting this Court to again remand the papers of this case to the Superior Court so that the plaintiff's new trial motion could be assigned and heard. We ordered remand on the same day that the motion was filed, and Anthony subsequently filed a third new trial motion on July 22, 1993.[6] That motion alleged that the

---

5. See Appendix for a copy of defense exhibit R.

6. In his decision on the new trial motion the Superior Court trial justice discussed the issue of

trial justice's decision "contains a misstatement, which has been picked up in the judgment prepared by the defendant," and that an evidentiary hearing should be held in order to determine how much of the Searle land Anthony was actually entitled to based upon the plaintiff's trial testimony, which had been accepted as credible by the trial justice.

Finally having the opportunity to end what he termed the "procedural nightmare," the trial justice on March 3, 1994, rendered a decision denying Anthony's third new trial motion. Relying upon our opinion, *American Federation of Teachers v. Rhode Island Board of Regents for Education,* 477 A.2d 104 (R.I.1984), the trial justice properly determined that Anthony was not entitled to a new trial since the plaintiff made no allegation of newly discovered evidence, nor that the trial justice had committed a "manifest error of law."

We next address defendant's appeal from the trial justice's ruling on the adverse possession issue.

### III

### The Adverse Possession

 Rhode Island law, by statute, prescribes what set of circumstances must occur before one is divested of legal title to real property as a consequence of that land's being adversely claimed and possessed by another. The adverse possession statute, G.L.1956 § 34–7–1, provides as follows:

"Where any person or persons, or others from whom he, she, or they derive their title, either by themselves, tenants or lessees, shall have been for the space of ten (10) years in the uninterrupted, quiet, peaceful and actual seisin and possession of any lands, tenements or hereditaments for and during that time, claiming the same as his, her or their proper, sole and rightful estate in fee simple, the actual seisin and possession shall be allowed to give and make a good and rightful title to the person or persons, their heirs and as-

signs forever; and any plaintiff suing for the recovery of any such lands may rely upon the possession as conclusive title thereto, and this chapter being pleaded in bar to any action that shall be brought for the lands, tenements and hereditaments, and the actual seisin and possession being duly proved, shall be allowed to be good, valid and effectual in law for barring the action."

This Court has further explicated this statute by providing concrete elements that are necessary to prove adverse possession. It is well settled in this jurisdiction that "in order to establish adverse possession under § 34–7–1, a claimant's possession must 'be actual, open, notorious, hostile, under claim of right, continuous, and exclusive.'" *Locke v. O'Brien,* 610 A.2d 552, 555 (R.I.1992) (quoting *Sherman v. Goloskie,* 95 R.I. 457, 465, 188 A.2d 79, 83 (1963)). Further, "[a] claimant must establish the indicia of adverse possession for a period of ten years." *Locke,* 610 A.2d at 555 (citing § 34–7–1). "Evidence of adverse possession must be proved by strict proof, that is, proof by clear and convincing evidence of each of the elements of adverse possession." *Locke,* 610 A.2d at 555.

Cognizant of the fact that we have interpreted the elemental requirements of adverse possession on numerous occasions, *see Lee v. Raymond,* 456 A.2d 1179, 1182 (R.I. 1983), we shall only briefly readdress them here.

 The elements of "actual" and "continuous" possession are successfully established when the claimant shows that " 'the use to which the land has been put is similar to that which would ordinarily be made of like land by the owners thereof.'" *Id.* at 1183. "Additionally, the continuity of the possession must be sufficient to signal the true owner of the land that a claim of title contrary to his own is being asserted." *Id.* The "notorious" and "openness" elements are established by a showing that "the claimant

whether the Superior Court properly had jurisdiction over the matter because of the fact that the case had already been appealed to, and docketed in, this Court. The trial justice determined that there was such jurisdiction in the Superior

Court since the judgment had not yet been entered at the time that the appeal was taken. This jurisdictional issue has not been raised on this appeal; therefore, we shall not address the matter further.

goes upon the land openly and uses it adversely to the true owner. The owner then becomes chargeable with knowledge of what is done openly on the land." *Gammons v. Caswell,* 447 A.2d 361, 367 (R.I.1982). A claimant makes a showing that the possession was "hostile" if a determination is made "that the possession of the occupier is to a visible line in all events, regardless of the location of the true boundary line." *LaFreniere v. Sprague,* 108 R.I. 43, 50, 271 A.2d 819, 822 (1970). Regarding the elements of "claim of right" and "exclusivity," we discussed in *Gammons* that in order for a defendant to successfully defend against an adverse possession claim of disputed land, "there would have to be evidence indicating that the defendants or others had made improvements to the land or, at the very least, had used the land in a more significant fashion than merely walking across it." *Gammons,* 447 A.2d at 368.

In sum, we have opined "that the ultimate fact to be proved in adverse possession is that the claimant has acted toward the land in question 'as would an average owner, taking properly into account the geophysical nature of this land.'" *Id.* (quoting 7 Powell, *The Law of Real Property* § 1018 at 740 (1981)). We further noted in *Gammons* that "[c]ultivating land, planting trees, and making other improvements in such a manner as is usual for comparable land have been successfully relied on as proof of the required possession." *Id. See also* 3 Am.Jur.2d *Adverse Possession* §§ 58–60 (1986).

In this case, the trial justice found that Anthony "presented undisputed evidence of his cultivation of the land in controversy by planting trees, maintaining a lawn over the disputed area and making other improvements including the erection of a rabbit hutch and two cold frames." The trial justice also determined that "[t]he aforesaid activities were initiated on or before May of 1981 and continued thereafter until the defendants bulldozed various plantings of the plaintiff on or about the end of July, 1991." The trial justice then embarked upon what we view as a meticulous journey through the above-discussed elements of adverse possession, explaining in detail the manner by means of which Anthony's use of the land had satisfied those requirements.

■■■ "The findings of adverse possession by a trial court sitting without a jury are entitled to great weight and will not be overturned unless the factual finding is clearly wrong or unless the trial court overlooked or misconceived material evidence." *Walsh v. Cappuccio,* 602 A.2d 927, 930 (R.I.1992) (citing *Hilley v. Simmler,* 463 A.2d 1302, 1304 (R.I.1983); *Lee v. Raymond,* 456 A.2d at 1184). After our examination of the record, we are of the opinion that the trial justice's findings are supported by the relevant, substantial, and probative evidence therein, and that there was no error in his finding that Anthony had used and cultivated the Searle land for the mandated statutory period, nor did he err in finding that the adverse nature of the possession was actual, open, notorious, hostile, under claim of right, continuous, and exclusive.

## IV

### The New Trial Motion

■■■ In reviewing the Superior Court trial justice's denial of the plaintiff's motion for a new trial, we address Rule 59(a)(2) of the Superior Court Rules of Civil Procedure as it existed at the time of trial in 1992. The rule states in applicable part:

"A new trial may be granted to all or any of the parties and on all or part of the issues * * * (2) in an action tried without a jury, for any of the reasons for which rehearings have heretofore been granted in suits in equity in the courts of this state. On a motion for a new trial in an action tried without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment."

In interpreting this rule, we have held that a trial justice sitting without a jury may *only* grant a new trial, "(1) if there is an error in the judgment that is manifest on the face of the record without further examination of matters of fact or evidence; or (2) if the trial justice is satisfied that newly discovered evi-

dence has come forward which was not available at the first trial and is of sufficient importance to warrant a new trial." *Tillson v. Feingold*, 490 A.2d 64, 66 (R.I.1985) (citing *Colvin v. Goldenberg*, 108 R.I. 198, 208, 273 A.2d 663, 669 (1971)).

The plaintiff's new trial motion in this case did not fulfill either of the conditions necessary to warrant the granting of his motion by the trial justice. The plaintiff asserted in his motion that the trial justice had misconstrued the evidence and made incorrect findings of fact in determining the proper boundaries of the adversely possessed slice of land. However, the motion neither alleged that there was an error in the judgment that was manifest on the face of the record without having to resort to a further examination of matters of fact or evidence, nor was there an allegation that any newly discovered evidence was previously unavailable to the plaintiff. We have held that when a party makes a new trial motion after a nonjury trial in which it does not allege either of the grounds upon which a new trial may be granted pursuant to the provisions of Rule 59(a)(2), that motion is a "nullity." *Tillson*, 490 A.2d at 66. The mere fact that the plaintiff disagreed with the trial justice's determination that the "lawn transition texture line" was the correct extent to which the plaintiff had adversely possessed the defendant's property does not merit the granting of a new trial in a case in which the trial justice sitting without a jury and, having been exposed to all the evidence, then made findings of fact and conclusions of law that we find from the record to be amply supported by the trial evidence. The trial justice determined that the trial exhibit prepared by the defendant's registered land surveyor accurately reflected the portion of land that the plaintiff had adversely possessed for the required statutory period of ten years. We shall not upset that fact-driven assessment.

We believe that the basic thrust of the plaintiff's new trial motion was a request that the trial justice "schedule a brief evidentiary hearing" so that the plaintiff could attempt to persuade the trial justice to change his mind—and consequently his factual findings. In denying this motion, the trial justice was correct in citing our opinion in *American Federation of Teachers v. Rhode Island Board of Regents for Education*, 477 A.2d 104 (R.I.1984), which held that "reconsideration merely to relitigate old matters is not available under Rule 59(e)." In that case we also stated that a "manifest error of law in a judgment would be one that is apparent, blatant, conspicuous, clearly evident, and easily discernible from a reading of the judgment document itself." 477 A.2d at 106. We further opined that if the alleged error is not obvious unless one reads the underlying decision, then it is not a manifest error. *Id.* Having read the judgment document, we discern no conspicuous error in this case and therefore hold that the trial justice did not err in denying the plaintiff's motion for a new trial.

For the reasons herein above stated, the appeals of both the defendant and the plaintiff are denied and dismissed, the final judgment is affirmed, and the papers of this case are remanded to the Superior Court.

APPENDIX

THIS MAP SHOWS THE COMPILATION OF DATA PRODUCED BY PHOTOGRAMMETRIC AERIAL MAPPING, BASED ON AN AERIAL PHOTOGRAPH # 84ZC 7065, EXPOSED AUGUST 22, 1984, PROPERTY OF NOAA, NATIONAL OCEAN SERVICE, AND A MA ENTITLED,"PLAN OF SURVEY FOR KAY AND HERB SEARLE, SCALE: 1"=20', JULY 28, 1990", BY JAMES G. HOARD, R.L.S., PROV., R.I.