[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
In this action to quiet title, the parties dispute the ownership of approximately four thousand four hundred eighteen (4,418) square feet of land owned by Defendant, Holy Ghost Brotherhood Charity (Holy Ghost), in the City of East Providence, Rhode Island (the City). (Joint Exhibit A, Full.) This matter was tried before this Court without a jury.
Plaintiffs, Manuel Machado and Maria Machado (the Machados), commenced this action, seeking to quiet title concerning a dispute over the ownership of two sections of the land between property they own and property Holy Ghost owns. The Machados seek to quiet title under either the doctrine of adverse possession
or alternatively under the doctrine of acquiescence. Holy Ghost counterclaimed against the Machados contending that they are trespassing on its land.
Holy Ghost, a Non-Profit Corporation, is the record owner of the disputed land situated on Lot No. 5 on Assessor's Plat No. 36. The disputed strip of land lies on both the easterly side, (outside the fence) and the westerly side (inside the fence) of the chain link fence line depicted on a survey. (Plaintiffs' Exhibit 1, Full.) The testimony and evidence introduced at trial establishes that the Machados in 1989 erected a chain link fence (new fence) across part of the disputed land; as a result, some of Holy Ghost's land is now inside the fence closer to the Machado's home and the other is located outside the fence
closer to Holy Ghost's building.
 Travel/Facts
The parties in their "Agreed Statement of Facts" (Joint Exhibit A, Full) and the Machados' deed (Plaintiffs' Exhibit J, Full) establishes that the Machados bought their singlefamily home located on Lot 36 on Assessor's Plat No. 36 in the City of East Providence on March 31, 1965, and have resided there since. The Machados' property faces Sanford Street. The Machados maintained that when they purchased the property their easterly property line was marked by a cement wall with a different chain link fence atop the wall running from the front to the rear of the property.
When the Machados originally purchased their property, according to their deed and from the testimony of their witness Louis Federici (Federici), a Registered Land Surveyor in the State of Rhode Island, their property fronted Sanford Street for approximately 50.49 feet. Federici researched records and prepared for the Machados' use in this matter a "Perimeter Survey." (Plaintiffs' Exhibit 1, Full.)
Federici also testified and the Perimeter Survey further established that the Machados' property was bounded generally to the east by Colwell Street for approximately 141.62 feet in a generally northerly direction. Colwell Street lies on the westerly side of the Holy Ghost property. When the Machados originally purchased their property, Colwell Street was not an improved or accepted street; rather it was a "paper street"[1] existing only on the land records. Mr. Machado testified when he and his wife first purchased the property a different fence existed on the right side of his property as one would look at the front of the property. Mr. Machado, when he first acquired his property, characterized the property on the other side of his fence as a "junk yard" littered with tires, refrigerators, etc. that he and two neighbors cleaned up over a period of time.
The parties agree that in 1968 the Machados, desirous of expanding the footprint of their home, sought a permit (Defendants' Exhibit E, Full) from the City to install a breezeway and a carport to the front of their home. When they applied for the permit, the City informed the Machados that they should first apply for abandonment of Colwell Street. The Machados applied for the abandonment of the Colwell Street property in 1968. However, the City did not abandon Colwell Street until August 20, 1979. (Exhibit C, Full and Exhibit I, Full.) The abandoned portion of Colwell Street is shown on a recorded plat of the land called "Watchetmoket Plat East Providence, Rhode Island Belonging to J.A. Chedel Surveyed 
Platted by Cushing Co. Oct. 1872" and also on Tax Assessor's Plat No. 12. (Exhibit C, Full and Exhibit I, Full.) Following the abandonment of what was once the Colwell Street property, it was divided in half between the Machados and Holy Ghost.
The parties agree that after the Town abandoned Colwell Street, Holy Ghost commended a project to fill in and alter the grade of the westerly portion of its property for parking. The "filling in" of Holy Ghost's property created a gully between the Machados' earlier fence and the parking area for Holy Ghost. A survey conducted by the Machados and Holy Ghost showed a sharp decline of approximately four (4) feet below the parking area creating the gully. The gully that contains part of the disputed land is approximately ten (10) to fifteen (15) feet wide between the new fence line and Holy Ghost's parking area. The disputed strip of land that lies on the easterly side of the new fence line is not on the same level of grade to that of the parking area. Holy Ghost did not fill in or alter the portion of the disputed land.
The testimony from all witnesses showed that at no time after the Machados acquired their property and February 2, 1989, did Holy Ghost make any demand that the Machados cease trespassing on any of the disputed land Once the Machados erected their new fence, on Holy Ghost's real property, an attorney for Holy Ghost sent a letter to the Machados dated February 2, 1989, informing the Machados that Holy Ghost surveyed the real property and found that the Machados had encroached on Holy Ghost's property by building a chain link fence on it. (Plaintiffs' Exhibit 3, Full.) The letter demanded that the Machados remove the fence, purchase an easement for the fence, or purchase the property. Holy Ghost also stated that it would take legal actions against the Machados if they refused to comply with Holy Ghost's request. On February 20, 1989, the Machados' attorney replied to Holy Ghost's letter, refusing to comply with defendant's request. (Plaintiffs' Exhibit 10, Full.)
Based on the credible testimony, in 1990 Mr. Machado approached an employee of Holy Ghost and instructed him not to dump debris or alter the disputed land, and the employee complied with Mr. Machado's request. The Machados testified that in 1992 they planted a tree outside the fence on part of the disputed land (Plaintiffs' Exhibit 17, Full.) They further testified the tree remains where they planted it within the disputed piece of property. A witness for Defendant, John Medina, testified that Joe Sousa, the vice-president of Holy Ghost at that time, uprooted the tree. The Machados, on the other hand, testified that the vice-president broke only a branch of the tree.
The testimony revealed Holy Ghost was aware that the Machados cut and maintained the grass on all of the disputed land and Holy Ghost did not file a notice of intent to dispute the Machados' adverse possession of the subject property in the Land Evidence Records as required in Rhode Island General Laws § 34-7-6. (Joint Exhibit A, Full.)
The Machados testified that over the course of years, they removed trash, debris, shrubs, and foliage on the land; planted grass; mowed and fertilized the lawn; planted a row of hedges; planted a tree; walked and played with family dogs; played with their children; and built snowmen on the disputed property outside the new fence. A witness for the Machados, Daniel DaSilveira (DaSilveira), testified that he never saw anyone cut the grass in the disputed area. However, John Medina testified on behalf of Holy Ghost that Holy Ghost cut the grass, including the strip of land in dispute. Another witness for Holy Ghost (also the Machados' rear neighbor), Jose Silveira (Silveira), testified that he and his children also use the gate from his backyard for access to Holy Ghost's property. In addition, Silveira testified that he cleaned up and maintained the lawn on the strip of the land On August 15, 2001, the Machados filed this action to quiet title on the parcel in dispute.
 The Adverse Possession Claim
Rhode Island General Laws § 34-7-1 provides that a person claiming title to a land through adverse possession must have maintained "uninterrupted, quiet, peaceful and actual seisin" of that land for a period of ten (10) years. A claimant must show by strict proof that the possession was "actual, open, notorious, hostile, under the claim of right, continuous, and exclusive" for the statutory period of ten years." DeCosta v. DeCosta,819 A.2d 1261, 1264 (R.I. 2003) (citing Carnevale v. Dupee,783 A.2d 404, 409 (R.I. 2001)). The term "strict proof" means that the claimant must prove each of these elements by clear and convincing evidence. Id. Each adverse possession case depends on individual facts and unique circumstances surrounding it.Dodge v. Lavin, 34 R.I. 514, 518-19, 84 A. 857, 858 (1912).
Before addressing the elements of adverse possession, it must be recognized that the Machados cannot claim that their adverse possession, from Holy Ghost or the City, began in 1965. This is because the Town of East Providence did not abandon Colwell Street, a public land, until August 20, 1979. Generally, as to public land, private individuals cannot possess it by claiming adverse possession. Hall v. Nascimento, 594 A.2d 874, 877 (R.I. 1991). More specifically, no right or title can be acquired in a public highway by adverse possession. Gammons v. Caswell,447 A.2d 361, 366 (1982) (citing Knowles v. Knowles, 25 R.I. 324,55 A. 755, within Parillo v. Riccitelli, 84 R.I. 276, 279,123 A.2d 248, 249 (1956)). Therefore, Machados' adverse possession claim began no earlier than August 20, 1979.
This Court must next determine whether the Machados proved they have possessed the subject property for a statutory period of ten (10) years as set forth in Rhode Island General Laws, 1956, §34-7-1. The City abandoned Colwell Street on August 20, 1979. Therefore, the Machados must prove by clear and convincing evidence that they used and maintained the subject property for ten (10) years beginning from August 20, 1979. The Machados introduced "minutes" from a meeting held by Defendant on August 6, 1979. Those "minutes" established Defendant knew of and did not object to another neighbor, Joe Ferreira, seeking the abandonment of Colwell Street. (Plaintiffs' Exhibit 28, Full.) Those "minutes" show that Defendant knew that as a result of the proposed abandonment Defendant would "gain fifteen feet at no cost." The Machados testified that over a period of years they tended to the disputed property. In addition, Plaintiffs introduced photographs taken in 1981, (Plaintiffs' Exhibits 13 and 14, Full), which shows the care and condition of the land at that time. These exhibits also show the original fence line, the area cleared of "junk" and debris and also an area of considerable overgrowth of vegetation.
The Machados provided compelling evidence to show they began using and maintaining the disputed land in 1979, after the City abandoned Colwell Street. The Machados erected a chain link fence sometime before February 2, 1989. After the Machados erected the new fence, Holy Ghost notified the Machados that they had encroached upon their land However, Defendant failed to take the required action to record the notice to challenge the Machados' use of the property as required in Rhode Island General Laws §34-7-6. Holy Ghost offered no evidence excusing its failure to do so. Therefore, the Machados have more than met the required statutory period of ten (10) years.
In addition to the Machados meeting the statutory period of ten (10) years, this Court must also decide whether the Machados maintained the property in "actual, open, notorious, hostile, under the claim of right, continuous, and exclusive" possession during the statutory period. The "actual" and "continuous" elements do not require constant use of the disputed land Leev. Raymond, 456 A.2d 1179, 1183 (R.I. 1983). "The test is whether the use to which the land has been put is similar to that which would ordinarily be made of like land by the owners thereof." Id. (quoting Russo v. Stearns Farm Realty, Inc., 117 R.I. at 392, 367 A.2d at 717). To determine whether a person claiming a land through adverse possession actually possesses the property, the court must consider the "character and locality, and the uses and purposes" of the disputed land Sherman v.Goloskie, 95 R.I. 457, 466,188 A.2d 79, 84 (1963). Here, the character of the land was described as a "junk yard" from the time the Machados acquired their land until Mr. Machado and his neighbors cleaned it up. Thereafter, Mr. Machado planted a row of hedges and mowed the grass. Later Mr. Machado removed the row of hedges so that he could erect the chain link fence.
As previously noted because that land was public land until 1979, any efforts by Mr. Machado before that time to exercise "actual" and "continuous" use of the disputed land was meaningless. On the other hand, after the abandonment of Colwell Street, the use by the Machados of the land becomes critical. Was the purpose that the Machados put the land to use, before the chain link fence was erected in 1989, similar to the purpose that other landowners would put to such land? According to the testimony introduced at trial, not only did the Machados use the disputed portion of land for a number of purposes, including for their children to play on, Silveira and his children crossed over the disputed land without any interference by the Machados. Even though Silveira did not characterize the crossing over the land as playing on it, his testimony supports the Machados' position that they used the land similar to that to which it would be put to by the owners. However, given the character of the land, Silveira merely crossing over the land did not disrupt the Machados' claim. Gammons v. Caswell, 447 A.2d 361, 368.
To establish the "openness" and "notorious" elements, the Machados must demonstrate that they go to the land openly and use it adversely to the true owner. Anthony v. Searle,681 A.2d 892, 898 (R.I. 1996) (citing Gammons v. Caswell, 447 A.2d 361. 367 (R.I. 1982)). The true owner is charged with the knowledge of what is done openly on the land Id. In this case, the Machados established that they used the land "openly" and "notoriously." Mr. Machado testified that after Holy Ghost, through their attorney, asserted the Machados were trespassing, he insisted that a person working for Holy Ghost not deposit any debris on the land The letter to the Machados irrefutably establishes Defendant knew what was being done on the land The Machados have satisfied this element of their claim.
As to hostility, claimant's possession of the land is hostile where the visible boundaries have existed for the statutory period of ten years. Lee v. Raymond, 456 A.2d 1179, 1183 (R.I. 1983). It is immaterial whether the "possession was due to inadvertence, ignorance, or mistake." Id. In addition, hostility "does not connote a communicated emotion, but rather, action inconsistent with the claims of others." Id. A person is a hostile occupant if he mistakes his boundary, but continuously asserts dominion over the disputed land for the statutory period.Id. Here, the Machados installed a fence on part of the disputed property and also mowed the grass on the other part of the property. In addition, when Holy Ghost wrote a letter to the Machados, the Machados refused to remove the fence and continued using the land Furthermore, the Machados still left the tree on the disputed property even though the vice-president of Holy Ghost at that time broke a branch of it. The Court finds the testimony of the Machados' neighbor, Silveira, that he also used and maintained the land outside the fence unsupported by any other evidence. Even if it were to be accepted, Mr. Silveira did not establish how he used the land nor did he claim to own the disputed piece of land The Machados met the hostility element because their actions were hostile and inconsistent to the claim of Defendant.
Claim of right shares the same rule with exclusivity. A claim of right arises through objective acts of the claimant establishing ownership of the disputed land that are adverse to the recorded owner's rights. Carnevale v. Dupee, 783 A.2d 404, 412 (2001). A claim of right means that the claimant is convinced that he/she owns the land in dispute.
In order to determine that Plaintiffs did not use the land exclusively and without interruption from the Defendant or others, evidence must show that "defendants or others had made improvements to the land or, at very least, had used the land in a more significant fashion than merely walking across it."Gammons v. Caswell, 447 A.2d 361, 368 (R.I. 1982). An adverse user does not maintain exclusive possession of a property if he/she merely shares dominion over the property with other users.Short Beach Cottage Owners Improvement Association v. Town ofStratford, 154 Conn. 194, 200, 224 A.2d 532, 534 (1966). InGammons, the court also reasoned that Mr. Gammons, the plaintiff, posted a sign on the disputed land to keep people out of it, and he also verbally disputed any claim of a right-of-way.Gammons at 368. In addition, a large area of the land around the disputed land is undeveloped today. Id. at 362. The plaintiff in Gammons cleared part of the undeveloped land close to his residence and planted grass, a garden, and trees. Id. at 363. Furthermore, the Supreme Court of Connecticut held that the plaintiff never maintained an exclusive possession of the property over the beach area because other people occupied the cottages on the property she claimed to possess. Short BeachCottage Owners Improvement Association at 534.
Regarding the uninterrupted use of the land, the following three ways are deemed to interrupt the claimant's continuous use of the land: 1) filing of an action to quiet title, CumberlandFarms v. Mayo Corp., 694 A.2d 752, 753 (R.I. 1997); 2) filing of "notice of intent to dispute" adverse possession, R.I. Gen. Laws 2002 § 34-7-6; and 3) physical ouster of the person claiming the land through adverse possession or a "substantial interruption" of their possession by the record owner. Carnivalev. Dupee, 783 A.2d 404, 409, 410 (2001); LaFreniere v.Sprague, 108 R.I. 43, 52, 271 A.2d 819, 824 (1970). Survey of the disputed property and subsequent notice of the survey or notice to the party claiming the property by adverse possession informing the claimant of the encroachment on the property is insufficient to constitute a "substantial interruption" of claimant's use of the disputed land Carnivale at 411 (R.I. 2001); LaFreniere at 52, 824 (1970).
Holy Ghost never filed an action to quiet title, notice of intent to dispute, or physically ousted the Machados. The letter Holy Ghost sent to the Machados cannot be deemed "substantial interruption" under Carnivale and LaFreniere. Silveira's testimony that he and his family used and maintained the property outside the fence, if properly established, defeats the Machados' claim to quiet title through adverse possession.
The Machados have the burden of proving by clear and convincing evidence that they exclusively used the property without any interruption from Silveira or other people, including Holy Ghost. Based on the testimony that this Court finds to be credible and the evidence that this Court considers compelling, the Machados have met the requirements of adverse possession as to all of the disputed property both outside the fence and the disputed property inside the fence.
 The Doctrine of Acquiescence
The Machados alternatively ask this Court to consider the doctrine of acquiescence. According to the doctrine of acquiescence, "when there is an `observable physical boundary line a claimant can gain title to the real estate encompassed by that boundary line, even though another party clearly possesses the record title to that land'" DeCosta v. DeCosta,819 A.2d 1261, 1264 (R.I. 2003) (quoting Locke v. O'Brien,610 A.2d 552, 556 (R.I. 1992)). The party asserting the doctrine of acquiescence must prove that absent evidence of an express agreement, a boundary marker existed and the parties recognized the boundary for a period equal to that prescribed in the statute of limitation to bar re-entry or ten (10) years. Id. The element of recognition "may be inferred from the silence of one of the parties or their predecessors in title who are aware of the boundary line." Locke at 556. In DeCosta, the court held that defendant met the requirements for the doctrine of acquiescence because plaintiff kept silent about the real property line when defendant planted the hedgerow. DeCosta, 819 A.2d at 1265.
Applying the DeCosta rule to this case, the Machados have failed to establish they are entitled to the property under the doctrine of acquiescence because when they erected the fence, Holy Ghost objected by writing the Machados a letter asking them to remove the fence, purchase the land, or purchase an easement for the fence. In addition, when the Machados planted the tree, Holy Ghost objected by pulling out the tree or breaking the branch of the tree.[2] Holy Ghost never kept silent during those times the Machados tried to establish physical boundaries. Therefore, the Machados claim of the land under the doctrine of acquiescence fails.
In conclusion, the Machados proved that their possession of the subject property outside and inside the fence was actual, hostile, under the claim of right, continuous, and exclusive for the statutory period of ten (10) years as required by adverse possession. Regarding the subject property inside and outside the fence, the Machados established adverse possession by clear and convincing evidence. Plaintiffs' claim of adverse possession is granted. The Machados failed to prove that Holy Ghost acquiesced to the property line outside the fence.
Defendant failed to prove that the Machados trespassed on the land Defendant's counterclaim is denied and dismissed.
Counsel for the prevailing party shall submit an Order consistent with this Decision.
[1] A paper street is a street which appears on a recorded plat but which in actuality has never been open, prepared for use, or used as a street. Robidoux v. Pelletier, 120, R.I. 425, 438,391 A.2d 1150, 1157 (1978) (citing Raiolo v. Northern Pac. Ry.,108 Minn. 431, 122 N.W. 489 (1909)).
[2] There are two inconsistent testimonies as to whether an employee of Holy Ghost uprooted the tree or broke the branch of the tree.