Peter A. CARNEVALE et al.

v.

Joan L. DUPEE.

No. 99–499–Appeal.

Supreme Court of Rhode Island.

Nov. 2, 2001.

S. Paul Ryan, James P. Marusak, Providence, for Plaintiff.

Donato A. D'Andrea, Newport, for Defendant.

Present WILLIAMS, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

LEDERBERG, Justice.

This case arose from a dispute among abutters over the ownership of land in Jamestown, Rhode Island. Joan L. Dupee (Dupee) has appealed from a Superior Court judgment in favor of Peter A. Carnevale and Rochelle T. Carnevale (the Carnevales) and Ronald J. Rodrigues (Rodrigues). Dupee's claims of title to the disputed parcel rested on her warranty deed, quitclaim deed, and adverse possession. Dupee also appealed the denial of her motion to vacate the judgment or for a new trial based on newly discovered evidence. We vacate the judgment and remand the case to the Superior Court for

findings of fact on Dupee's adverse possession claim.

## The Land in Dispute

At issue is a strip of land approximately 46 feet wide and 675 feet long. The disputed strip and the surrounding parcels, now owned by the parties, were all owned in 1947 by Federal Building and Development Corporation (Federal). In July 1948, Federal conveyed a portion of the property to Thomas and Mildred McGrath by warranty deed (McGrath deed). The McGrath deed described an approximately four-acre parcel, with dimensions of 600 feet on the east and 300 feet on the south, "more or less." In 1949, Federal filed a subdivision plan with the Town of Jamestown that showed the southern border of the McGrath property as approximately 326 feet.

On October 6, 1978, Richard McGrath, Thomas's son, conveyed the property to Dupee, delivering a warranty deed (Dupee warranty deed) and a quitclaim deed with an attached "tape survey" (Butler Tape Survey). The Dupee warranty deed contained the same property dimensions as did the McGrath deed and described the property conveyed as the same "premises" that had been conveyed to the McGraths by Federal in 1948. The quitclaim deed purported to grant Dupee property delineated as lot No. 609 on a Jamestown plat map. The Butler Tape Survey attached to the quitclaim deed indicated that the property conveyed had total dimensions of 847 feet by 346 feet, almost seven acres. Thus, the quitclaim deed appeared to add a strip of land, forty-six feet wide, to the western edge of the land delineated in the warranty deed (lot No. 609).

The property that the Carnevales and Rodrigues eventually purchased was conveyed by Federal to West Passage Development Corporation in 1977. In 1983, West Passage conveyed the property to Jamestown Estates, Inc. (Jamestown Estates), which surveyed and re-subdivided the land in 1987. On July 1, 1987, Jamestown Estates filed a subdivision plan (Ryan Survey or survey) with the Jamestown Planning Board, and on August 18, 1987, the Town of Jamestown sent a letter by certified mail to Dupee, an abutter, notifying her that the Jamestown Planning Board would hold hearings on the proposed subdivision and that site plans were available for viewing at the Jamestown Planning Office. The Ryan Survey was recorded in the Land Evidence Records on May 6, 1988.

In December 1990, the Carnevales purchased lot No. 2, assessor's plat No. 8, lot No. 662 (Carnevale lot) from Jamestown Estates at auction by quitclaim deed. At the same auction, Rodrigues purchased lot No. 3, assessor's plat No. 8, lot No. 663 (Rodrigues lot), also by quitclaim deed. The Ryan Survey shows the Carnevale lot mostly to the south of Dupee's property, with a twenty-foot-wide strip of land extending north to the waterfront through the disputed western portion of Dupee's land. The Rodrigues lot lies to the west of Dupee's land, overlapping with the disputed strip by about twenty-six feet at Dupee's southern boundary and about thirty feet at the northern boundary. Thus, beginning at the eastern edge of lot No. 609 and moving westward, the first 300 feet of land belong undisputedly to Dupee, the next 20 feet are claimed by the Carnevales and Dupee, and the following 26 to 30 feet are claimed by Rodrigues and Dupee.

## Use and Possession of the Land

At trial, evidence of human occupation and improvements on the contested land was undisputed. A building, known as the pump house, stood on the disputed strip, and to the north of the pump house, concrete "ponds" were built into the ground.

A fence ran along Dupee's southern boundary and the southern boundary of the disputed strip, continuing north along the western boundary of the disputed strip as far as the ponds, thereby enclosing the pump house onto the portion of land cleared and mowed by Dupee. In addition, Dupee alleged that an iron "pipe" or "post" five feet five inches high at the southwest corner of the disputed strip was her southwestern property marker.

The undisputed testimony of Frances Shepardson, Thomas McGrath's sister, established the existence of the pump house at its current location since 1948. According to Shepardson, the McGraths used the pump house and kept fish in the concrete ponds. Shepardson testified that her brother described his parcel to her as about five and a half acres and that the McGraths "assumed [the pump house] was theirs." Shepardson also remembered seeing the metal post, now claimed by Dupee as the southwest corner property marker, and stated, "It was all bramble" around the post. Shepardson did not remember a fence.

Dupee testified that she first viewed lot No. 609 in September 1978, accompanied by her real estate agent, Claudia Clarke, and her cousin, Robin Sue Farrell (Farrell). At that time, according to Dupee, she observed the fences along the south and west sides of the property. She testified that she was also shown the pump house and ponds, which she understood to be located on the land for sale. At trial, both Dupee and Farrell testified that these structures are in the same position now as they were when Dupee bought the property.

Dupee testified that in 1978 the land was cleared several feet past the pump house to the west and down to the southern fence. To the south and west of the property, on the other side of the fence, the land was uncleared and full of "bull briars." The testimony of Dupee, Farrell, and Dupee's nephew, Bobby Morris, established that, since 1978, Dupee has kept the land cleared to the same extent as it was when she first bought it, mowing the lawn frequently and replacing the fence in its original position.

Dupee testified that she kept animals (sheep, goats, ducks, geese, chickens and pigs) on the southwest side of the property, including on some of the disputed strip, from 1979 to 1991. Dupee also called the police to have trespassers removed from the wetlands north of the duck ponds up to the water line. According to Dupee, since 1979 she had posted signs against trespassers at several locations: on her eastern boundary, by the ponds and the pump house and, more recently, facing the Carnevales' yard. In 1992, Dupee saw a surveyor on her property and told him, "Get off my land." Dupee also testified that the first time anyone "claimed to own part of [her] land" was when the Carnevales came to speak to her about her southern fence cutting across the disputed strip.

## Procedural History

In 1992, Dupee recorded a Notice of Intent to Dispute the Carnevales' ownership of the contested property in the Land Evidence Records of the Town of Jamestown. The Carnevales filed a complaint to quiet title and for declaratory and injunctive relief against Dupee in May 1995, and Rodrigues was allowed to intervene as a plaintiff in June 1998. After a bench trial in 1999 in the Superior Court, a decision was issued in favor of plaintiffs.

In her decision, the trial justice found that the conveyance from McGrath to Dupee was controlled by the specific dimensions in the Dupee warranty deed. She therefore determined that Dupee never

held record title to the disputed property. With respect to Dupee's adverse possession claim, the trial justice found that there was no evidence that the McGraths asserted a claim of right to the disputed land, given that the boundary measurements in the McGrath deed clearly excluded the strip. Consequently, the trial justice found that the starting date for determining whether Dupee established a claim of adverse possession was October 1978, the date when Dupee purchased the property and began to occupy it.

The trial justice also found that Dupee's claim of right to the disputed strip was "extinguish[ed]" in 1987 given that

> "when Jamestown estates re-subdivided the land surrounding [Dupee's land], she was sent notice of said subdivision. The survey that was done in connection with this subdivision application clearly includes the disputed strip as a panhandle connected with the Carnevales' lot. * * * Furthermore, in her deposition, defendant admitted that she went to the Town planning office to view the layout and did not object to the plan even though the maps clearly include the disputed area in the Carnevales' lot."

In addition to extinguishing her adverse possession claim, the trial justice found that Dupee's failure to object to the subdivision barred her from claiming title pursuant to estoppel and laches, thereby adopting an argument advanced by the Carnevales.

Dupee prematurely filed notice of appeal in June 1999. Judgment was subsequently entered for plaintiffs on July 1, 1999. Dupee then moved to vacate the judgment or, alternatively, for a new trial based upon newly discovered evidence, namely, a purchase and sale agreement between the McGraths and Federal dated May 27, 1948, and a mortgage agreement between the McGraths and Aquidneck National Bank of Newport. Following the trial justice's denial of her motion, Dupee appealed the denial, and this Court consolidated the two appeals.

On appeal, Dupee raised five points of error: (1) the trial justice misconstrued the evidence concerning the deeds; (2) the trial justice made no findings of fact on the issue of Dupee's adverse possession and misconstrued the evidence concerning the adverse possession of Dupee's predecessors in title; (3) the trial justice erred in ruling that adverse possession can be interrupted by indirect notice that there is a dispute over the ownership of the land in question; (4) the trial justice failed to apply the principle of boundary acquiescence; and (5) the trial justice erred in denying Dupee's motion to vacate the judgment or for a new trial. We address only those issues relating to Dupee's adverse possession claim, as they are dispositive of this appeal.[1]

### Standard of Review

The findings of fact of a trial justice sitting without a jury are given great weight on appeal and will not be disturbed unless they are clearly wrong or unless the trial justice overlooked or misconceived material evidence. *Foley v. Osborne Court Condominium*, 724 A.2d 436, 439 (R.I.1999). This standard applies as well in adverse possession cases. *Anthony v. Searle*, 681 A.2d 892, 898 (R.I.1996). Questions of law, however, including questions of statutory interpretation, are reviewed *de novo* by this Court. *Levine v. Bess Eaton Donut Flour Co.*, 705 A.2d 980, 982 (R.I.1998) (per curiam). The question

---

1. Because we address only the adverse possession issue, for the purposes of this appeal, we accept the trial justice's finding that record title to the disputed property rested at all times with the Carnevales, Rodrigues and their predecessors in title.

of whether the 1987 filing of the Ryan Survey, Dupee's notice of the survey, and her failure to object are sufficient to interrupt Dupee's claim of adverse possession under G.L.1956 §§ 34–7–1 and 34–7–6 is a question of law that we review *de novo*.

### Interruption of Adverse Possession Under §§ 34–7–1 and 34–7–6

 On appeal, Dupee claimed that the trial justice erred in ruling that her adverse possession claim was extinguished in 1987. The trial justice found that the notice that Dupee received announcing the proposed subdivision, her viewing of the Ryan Survey on file with the Jamestown Planning Board, and her failure to object to the survey were sufficient to "extinguish [Dupee's] claim of right." [2]

 Adverse possession is governed by § 34–7–1.[3] We have consistently held that, in order to establish a claim of ad-

verse possession under the statute, "a claimant's possession must 'be actual, open, notorious, hostile, under claim of right, continuous, and exclusive,' " for the statutory period of ten years. *Locke v. O'Brien*, 610 A.2d 552, 555 (R.I.1992) (quoting *Sherman v. Goloskie*, 95 R.I. 457, 465, 188 A.2d 79, 83 (1963)); *see also Anthony*, 681 A.2d at 897. The party claiming title by adverse possession must prove each of these elements by "strict proof, that is, proof by clear and convincing evidence." *Anthony*, 681 A.2d at 897 (quoting *Locke*, 610 A.2d at 555).

Our case law has recognized three methods by which a record owner can interrupt a claimant's adverse possession: (1) filing of an action to quiet title, *Cumberland Farms, Inc. v. Mayo Corp.*, 694 A.2d 752, 753 (R.I.1997) (mem.); (2) filing of "notice of intent to dispute" adverse possession under § 34–7–6;[4] and (3) physical ouster

**2.** It is possible that the trial justice's phrase "extinguish [Dupee's] claim of right" was based on a finding that Dupee's failure to object to the Ryan Survey was sufficient to show that her possession was not *under* claim of right, as required by the adverse possession statute, see *post*. However, the question of whether land is occupied under claim of right is generally determined by the nature of the use and occupation itself, not by a failure to notify others of one's claim. "[A] claim of right to own or use property will arise by implication through objective acts of ownership that are adverse to the true owner's rights." *Reitsma v. Pascoag Reservoir & Dam, LLC*, 774 A.2d 826, 832 (R.I.2001). "[N]o particular act to establish an intention to claim ownership is required to give notice to the world of the claim." *Lee v. Raymond*, 456 A.2d 1179, 1183 (R.I.1983) (citing *Gammons v. Caswell*, 447 A.2d 361, 367 (R.I.1982)). It is more likely, therefore, that the trial justice found that Dupee's adverse possession claim was *interrupted* by the events of 1987, and it is this finding that we now address.

**3.** General Laws 1956 § 34–7–1 provides:

"**Conclusive title by peaceful possession under claim of title.**—Where any person or per-

sons, or others from whom he, she, or they derive their title, either by themselves, tenants or lessees, shall have been for the space of ten (10) years in the uninterrupted, quiet, peaceful and actual seisin and possession of any lands, tenements or hereditaments for and during that time, claiming the same as his, her or their proper, sole and rightful estate in fee simple, the actual seisin and possession shall be allowed to give and make a good and rightful title to the person or persons, their heirs and assigns forever; and any plaintiff suing for the recovery of any such lands may rely upon the possession as conclusive title thereto, and this chapter being pleaded in bar to any action that shall be brought for the lands, tenements or hereditaments, and the actual seisin and possession being duly proved, shall be allowed to be good, valid and effectual in law for barring the action."

**4.** Section 34–7–6 provides:

"**Notice of intent to dispute interrupting adverse possession.**—Whenever the legal owner of any lands anticipates that any other person or persons may obtain the title to those lands, or any way, easement or privilege therein, by possession under the provisions of this chapter, he or she may give notice in

of the claimant or a "substantial interruption" of the claimant's possession by the record owner. *LaFreniere v. Sprague*, 108 R.I. 43, 52, 271 A.2d 819, 824 (1970); 3 Am.Jur.2d *Adverse Possession* §§ 98, 124–26 (supp.2001).

It was undisputed that no judicial action was taken against Dupee until the abutting Carnevales filed this suit to quiet title in May 1995. Therefore, whether Dupee's adverse possession claim was interrupted in 1987 will depend on whether a proper "notice of intent to dispute" was filed in accordance with § 34–7–6 or whether a physical ouster or substantial interruption occurred.

A record owner may interrupt a claimant's adverse possession by serving the claimant with written "notice of intent to dispute." Section 34–7–6. This notice must be signed by the owner or his/her agent, served by a "disinterested person, making return under oath," and subsequently "recorded" within three months of service "in the records of land evidence in the town in which the land is situated." *Id.* "[A] copy of the record, certified by the recording officer to be a true copy of the record of the notice, and the return thereon, shall be evidence of the notice and of the service of the same." *Id.*

■ In the instant case, Jamestown Estates never complied with the provisions of § 34–7–6. Rather, it surveyed and subdivided the land and filed the Ryan Survey with the Jamestown Planning Board on July 1, 1987. The *town* then sent a letter to Dupee on August 18, 1987, return receipt requested, notifying her as an abutter that the Jamestown Planning Board would hold hearings regarding the proposed subdivision and that site plans were available for viewing at the Jamestown Planning Office. The survey itself was not recorded in the Land Evidence Records until May 6, 1988.

These actions do not satisfy the requirements of § 34–7–6. Dupee never received notice *from the record owner*, then Jamestown Estates, signed or otherwise, that it was challenging her occupation of the disputed land. The only notice she did receive was the letter from the Town of Jamestown, informing her that the land *abutting* her land was to be subdivided. This letter was never recorded in the Land Evidence Records, and the survey itself was not recorded until May 6, 1988, over eight months after Dupee's receipt of the letter.

It is our opinion that the filing of the Ryan Survey with the Jamestown Planning Board in 1987 and Dupee's subsequent notice thereof were insufficient, as a matter of law, to interrupt Dupee's possession under § 34–7–6. Consequently, the trial justice erred in finding the notice sufficient to interrupt Dupee's adverse possession claim.

writing to the person claiming or using the lands, way, easement, or privilege, of his or her intention to dispute any right arising from that claim or use; and the notice, served and recorded as hereinafter provided, shall be deemed an interruption of the use and prevent the acquiring of any right thereto by the continuance of the use for any length of time thereafter. The notice, signed by the owner of the lands, his guardian or agent, may be served by any disinterested person, making return under oath, on the party so claiming or using the property, his or her agent or guardian, if within this state, otherwise, on the tenant or occupant, if there be any; and the notice, with the return thereon, shall be recorded within three (3) months thereafter in the records of land evidence in the town in which the land is situated, and a copy of the record, certified by the recording officer to be a true copy of the record of the notice and the return thereon, shall be evidence of the notice, and of the service of the same."

■ We next address whether the 1987 survey itself and the subsequent notice to Dupee constituted a sufficient interruption to break the continuity and exclusivity of Dupee's possession under § 34–7–1. Generally, an "owner's use of land occupied by another under claim of right is * * * an exercise of the right of ownership that would interrupt the continuity required by [§ 34–7–1]." *LaFreniere*, 108 R.I. at 53, 271 A.2d at 824. We have held, however, that a record owner who merely surveys the land and informs the adverse claimant of the survey has not sufficiently interrupted possession under § 34–7–1. *Id.* at 53–54, 271 A.2d at 824.

In *LaFreniere*, the defendants were record owners who surveyed their land and informed the plaintiffs, the adverse claimants, that the plaintiffs' trees, bushes and cesspool were on the defendants' land. *Id.* at 52, 271 A.2d at 823. The plaintiffs responded by removing the stakes placed by the surveyors and continuing to occupy and maintain the disputed land as they had previously done. *Id.* at 53, 271 A.2d at 824. On the basis of those facts, this Court held as a matter of law that "the survey and the notice did not constitute a sufficiently substantial interruption to halt the running of [§ 34–7–1]." *Id.* at 52, 271 A.2d at 824.

■ In the case at bar, Jamestown Estates, the record owner of the disputed property in 1987, conducted a survey of the land, *viz.*, the Ryan Survey, of which Dupee received notice from the town.[5] The mere act of conducting the survey in no way interrupted Dupee's physical possession of the property, a conclusion we

reached in *LaFreniere* on similar facts. Here, in addition, there is no evidence in the record that surveyors ever physically entered the disputed property in 1987 or that stakes were placed on the land. After notice of the completed survey was sent to Dupee, she continued to occupy and maintain the property as she had since 1978, mowing the lawn and maintaining a fence on the southern and western boundaries of the disputed strip.

Hence, the 1987 survey by Jamestown Estates, the filing of the Ryan Survey with the Jamestown Planning Board on July 1, 1987, and the subsequent notice to Dupee were insufficient, as a matter of law, to interrupt Dupee's possession of the disputed property under §§ 34–7–1 and 34–7–6.

■ When addressing Dupee's adverse possession claim, the trial justice consistently pointed out Dupee's failure "to openly and hostilely assert her claim" to the disputed land, stating:

"[I]f [Dupee] truly believed that she had an undisputed right to this strip, either by title or adverse possession, one would expect her to vigorously assert that right at every opportunity. In the instant case, despite such opportunity, [Dupee] remained passive.

"The court agrees with plaintiffs' argument that [Dupee's] 'failure to object to the subdivision and subsequent auction, and her coincident failure to assert her claims, bar her in equity from claiming title pursuant to the theories of equitable estoppel [and] laches.'"

■ In so finding, the trial justice has misconstrued the law of adverse posses-

5. The trial justice found that Dupee viewed the Ryan Survey and that the survey "clearly incorporate[d] the disputed land into the Carnevale lot rather than the Dupee property." In fact, in contrast to a more recent survey conducted by Waterman Engineering for this trial, the Ryan Survey did not show the location of existing structures (such as the pump house or ponds) or their relationship to Jamestown Estates's proposed boundary lines.

sion. Section 34–7–1 creates a period of limitations on actions to quiet title that runs *against the record owner* of the land. The adverse possessor is under no duty to quiet title by judicial action, nor "to vigorously assert [her] right at every opportunity." By statute, upon ten years of "uninterrupted, quiet, peaceful and actual seisin and possession" of the land, "good and rightful title" vests immediately in the adverse claimant. Section 34–7–1; *see also Burke–Tarr Co. v. Ferland Corp.*, 724 A.2d 1014, 1020 (R.I.1999) (holding that title to a prescriptive easement under § 34–7–1 vested upon expiration of the statutory period).

Furthermore, as we have consistently stated, "no particular act to establish an intention to claim ownership is required to give notice to the world of the claim. It is sufficient for the claimant to go upon the disputed land and use it adversely to the true owner. The owner then becomes chargeable with knowledge of whatever occurs on the land in an open manner." *Lee*, 456 A.2d at 1183 (citing *Gammons*, 447 A.2d at 367). Thus, so long as Dupee's actual possession of the land was " 'open, notorious, hostile, under claim of right, continuous and exclusive,' " *Anthony*, 681 A.2d at 897, title would have vested in Dupee upon expiration of the statutory period.

In addition, under § 34–7–1, an adverse claimant may "tack on the period of possession of his predecessor from whom he derived title." *Taffinder v. Thomas*, 119 R.I. 545, 549, 381 A.2d 519, 521 (1977). With respect to this issue, the trial justice stated that "[t]here is no evidence that prior to his conveyance to Dupee, McGrath asserted a 'claim of right' with respect to the disputed strip. In fact, his warranty deed so clearly excludes this strip that the inference is against the aforementioned conclusion." The trial jus-

tice, then, based her finding that Dupee's adverse possession claim began to run in 1978 solely on her determination that the McGraths' possession of the disputed property failed to demonstrate a "claim of right." In our opinion, the trial justice erred in finding that the terms of the McGrath deed were dispositive of the issue of whether the McGraths occupied the land under a "claim of right."

Here, one must distinguish the term "claim of right" or "claim of title" from the term "color of title." In order to hold land under "color of title," a claimant must generally have a written instrument purporting to convey title. *See* 3 Am. Jur.2d *Adverse Possession* § 150. On the other hand, as we have noted, "a claim of right to own or use property will arise by implication through objective acts of ownership that are adverse to the true owner's rights." *Reitsma v. Pascoag Reservoir & Dam, LLC*, 774 A.2d 826, 832 (R.I.2001). As this Court observed in *Dodge v. Lavin*, 34 R.I. 514, 518, 84 A. 857, 858 (1912):

"It is true that [the claimant] and her predecessors did not hold this land under a color of title. The court has already found that the deed of 1857 did not in and by its description and terms include the land in question, but it does not follow, however, that it was not held under a claim of title. [The claimant] and her predecessors apparently understood that such land was covered by the deed of 1857, and she and they have accordingly occupied and exercised rights of ownership over it."

Therefore, the appropriate inquiry in deciding whether Dupee's predecessors in title occupied the disputed land under "claim of right" was whether they committed objective acts of ownership adverse to the true owner's rights, thus exercising the rights of ownership over the land. With

respect to this issue, the record contained undisputed testimony in favor of Dupee's claim that the trial justice was bound to consider in making her decision.[6] *See Jackowitz v. Deslauriers,* 91 R.I. 269, 274–76, 162 A.2d 528, 530–31 (1960).

Because the trial justice found that Dupee's adverse possession claim began to run no earlier than May 1978 and was extinguished in 1987, she never reached the issue of whether Dupee's possession (and that of her predecessors in title) otherwise met the requirements of § 34–7–1. Because we hold that the trial justice applied the wrong standard in determining whether the McGraths occupied the property under claim of right, and because we hold, as a matter of law, that Dupee's adverse possession claim was not interrupted in 1987, we must remand the case for further findings of fact on Dupee's adverse possession claim.

### Conclusion

In conclusion, therefore, we sustain Dupee's appeal and vacate the judgment of the Superior Court, to which we remand the case for a determination of Dupee's adverse possession claim.

---

**6.** Shepardson testified at trial that the McGraths used the pump house and kept fish in the concrete ponds from as early as 1948. Shepardson also testified that her brother described his parcel to her as about five and a half acres and that the McGraths "assumed [the pump house] was theirs." In addition, Dupee, Farrell and Morris all testified that the fences on the south and west sides of the property were in existence at the time Dupee purchased the property.