April 15, 2020

**Supreme Court**

No. 2018-17-Appeal.
(KC 14-271)

David Clark et al.                      :

v.                            :

Buttonwoods Beach Association.            :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

David Clark et al.     :

    v.       :

Buttonwoods Beach Association.[1]  :

Present: Suttell, C.J., Goldberg, Robinson, and Indeglia, JJ.

**O P I N I O N**

**Chief Justice Suttell, for the Court.** Located on a peninsula jutting out into Greenwich Bay, Buttonwoods is an historic and peaceful neighborhood in Warwick that traces its origins to a Baptist summer colony established in the "early nineteenth century * * * where people could combine recreational and religious activities in a wholesome, respectable environment."[2] The original tents have since been replaced by private homes and common facilities such as tennis courts and a multipurpose community building known as the "casino," yet in many respects time has seemed, if not to have stopped, at least to have slowed in Buttonwoods. To a large extent, it has retained its historic charm and it remains a pleasant neighborhood in which to live and to raise a family. It is also the scene of the appeal now before the Court.

When the plaintiffs, Judith and David Clark, purchased 243 Promenade Avenue in Buttonwoods (the property) in 2009, they believed they had also bought the waterfront lot across the street from their new home. Two years later, after a neighborhood association president told

---

[1] The proper name of the corporate defendant is "Buttonwood Beach Association."  It was created by an act of the General Assembly in May 1872.  The neighborhood itself is sometimes referred to as "Olde Buttonwoods."  We shall use its more common appellation of "Buttonwoods."

[2] This is part of the description for Buttonwoods provided in *The Buttonwoods Handbook: A Brief History & Rules and Regulations for Old Buttonwoods 2010*, entered for identification during trial but not made a full exhibit.

plaintiffs they did not own the entire waterfront lot, they commissioned a property survey. The survey showed that part of the land described in their deed was also included in an eighty-foot-wide public way owned by the neighborhood association, the defendant Buttonwoods Beach Association (BBA).[3] The plaintiffs filed suit against the BBA, alleging that they owned the property by adverse possession and acquiescence. The plaintiffs' claims were tried without a jury, and the trial justice concluded that plaintiffs had not proven either claim.

The plaintiffs now appeal from the judgment entered in favor of defendant, arguing that the trial justice misconceived and misconstrued the evidence at trial and erred as a matter of law when he concluded that plaintiffs had not satisfied the elements for claiming the disputed portion of the waterfront lot property by adverse possession.[4] For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

# I

## Facts and Travel

The Buttonwoods neighborhood in Warwick has several common areas, including tennis courts, a chapel, a baseball field, the "casino," and a beach area at the end of Buttonwoods Avenue. These common areas, as well as the roads within the neighborhood, are owned by the BBA. The BBA leases the roads to the Buttonwoods Fire District (BFD). The BBA is a private corporation, described through trial testimony as founded to be "the steward[] of the land, to protect * * * and preserve the land" for future generations. The BBA is owned by stockholders; Buttonwoods property owners were eligible to purchase up to two shares per household at $100 per share after they had been a resident for two years. The BFD was described in trial testimony as "the manager

---

[3] We append a copy of the survey to this opinion as Appendix A to provide a visual reference for the property features discussed herein.

[4] The plaintiffs do not appeal from the part of the judgment finding in favor of defendant on their claim for acquiescence.

of all of [the common areas] and it has a special taxing authority enabling it to fund those maintenance obligations." The BFD is run by three supervisors elected by residents of the neighborhood.

Judith and David Clark bought two properties in Buttonwoods in June 2009. One of the properties had a residence and a carriage house with an address on Promenade Avenue, and the other property had a residence with an address on Cooper Avenue. A brick walkway beginning at the base of the front porch of the residence on Promenade Avenue leads to a sidewalk and resumes across a paved roadway, continuing through a hedge with a white gate to a grassy area, beyond which is a concrete patio bordering a seawall, the beach, and the water of Greenwich Bay. (The area between the paved roadway and the seawall is hereinafter referred to as the waterfront lot.) The Clarks demolished the residence on Cooper Avenue, leaving an open space; merged this lot with 243 Promenade Avenue; and moved into the residence at 243 Promenade Avenue (hereinafter referred to as the residential lot). The residential lot and the waterfront lot are separated by a paved street, approximately twenty feet in width, known as Promenade Avenue. As the Clarks' survey disclosed, however, the full width of the Promenade Avenue right-of-way is eighty feet.

In July 2011, the Clarks posted four "private property" and "no trespassing" signs at various points on the waterfront lot after they had seen some strangers fishing off the seawall, asked them to leave, called the police, and received advice from the responding officer that they were exposing themselves to liability by not having any "no trespassing/private property" signs posted. Sometime after the Clarks posted the signs, Susan Phipps, a neighbor and then-President of the BBA, sent plaintiffs an email stating that the waterfront lot did not belong to them and instructed them to remove the "private property" signs. And so began the instant dispute between the Clarks and the BBA.

In March 2014, the Clarks filed a complaint in Kent County Superior Court against the BBA, claiming ownership of the entire waterfront lot by adverse possession and acquiescence by the BBA and seeking to quiet title to this lot. The case proceeded to a nonjury trial over six days in September 2016.[5] The trial justice heard testimony from plaintiff Judith Clark, six prior owners of 243 Promenade Avenue, four former BBA presidents, an attorney, a realtor, and a surveyor.

Peter Weichers, who owned the property from January 3, 1986, until October 20, 1989, testified that, when he bought the property, the realtor from the real estate agency told him he would own the entire residential lot as well as the entire waterfront lot. His realtor did not mention any property owned by the BBA. Weichers testified that, without asking permission from anyone, he planted a row of shrubs, installed a gate on the waterfront lot, and removed the existing seawall to replace it with a new one. No one from the BBA contacted him about the improvements he made to the waterfront lot. He also maintained the waterfront lot the entire time he owned the property.

Guy Hurley[6] bought the property from Weichers on October 20, 1989. When Hurley bought the property, he did not investigate the actual boundaries—he assumed that the fences around the residential lot marked the boundaries of that property and that the waterfront lot included the area from the hedge to the beach. Hurley testified that he was taxed on both properties, separately. Hurley also testified that no one ever told him differently about his

---

[5] On the first day of trial, the Clarks filed a motion to amend their complaint to expressly include the yard area in the front of the house on the residential lot. The BBA opposed the motion, and the trial justice reserved ruling on the motion until a later date. Our review of the record reveals that the trial justice did not rule on this motion either during the trial or in his written decision.

[6] Despite a subpoena in place compelling him to testify at trial, Hurley did not show up. By agreement of the parties, the trial justice allowed his deposition testimony, taken in September 2015, to serve as his trial testimony and the corresponding exhibits to be filed as part of the trial exhibits.

ownership status; he believed he had clear title to both properties. With respect to the waterfront lot, Hurley built a fence at the edge of the concrete patio and seawall to prevent people from falling off the seawall down to the beach. He also planted some shrubs on the waterfront lot and paid a landscaping company to maintain the waterfront lot during the tenure of his ownership. Hurley allowed neighbors to sit on the seawall and the beach. Hurley also testified that he had served as the head of the BFD as well as president of the BBA.

The Zigerellis bought the property on February 16, 1999. Nancy Zigerelli testified that she installed a stamped concrete walkway on the waterfront lot to match the walkway on the residential lot that began at the base of the front porch and ended at the sidewalk. Mrs. Zigerelli testified that she installed a bench on the waterfront lot, planted daylilies, installed a gate to fill the gap between the hedges near the street on the waterfront lot, and installed an underground sprinkler system (running the irrigation system under Promenade Avenue to reach the waterfront lot). She also paid a landscaping company to maintain the waterfront lot. Mrs. Zigerelli further testified that she requested permission from the BBA before she made any of the installations described above, but she did not have a record of those requests or the permissions granted by the BBA. At the BBA annual meeting the year she bought the property, Mrs. Zigerelli learned that part of the waterfront lot belonged to the BBA. She testified that she had received a pamphlet with all of the BBA's rules, which included information stating that Promenade Avenue was eighty feet wide. She also testified that she "made it clear that people were welcome" to use the waterfront lot, that she had installed the gate on the waterfront lot to prevent her young children from being able to quickly access the water unaccompanied by an adult, and that she had had no intention of claiming ownership to the waterfront lot.

Lawrence Zigerelli testified that he never believed he owned the entirety of the waterfront lot and that the unique location of the property boundaries had not concerned him because he believed in the principles of the general community and was happy to share the space. Mr. Zigerelli testified that the gate he and Mrs. Zigerelli installed on the waterfront lot was to keep his children safe and was never locked, but was merely kept closed to prevent their direct access to the water. He also testified that the first time he saw 243 Promenade Avenue, realtor and fellow Buttonwoods property owner Ronald Phipps told him that the property had not included the waterfront lot up to the seawall (but did include the seawall) and, on the residential lot, that the property had not included the front yard (because the residential lot ended at the base of the front porch). Since moving out of Buttonwoods in 2002, Mr. Zigerelli stated, he had kept in touch with some of the neighborhood's residents.

The Freemans bought 243 Promenade Avenue on December 13, 2002. Laura Freeman testified that she first moved into Buttonwoods in 1991, when she bought property on Cooper Avenue (directly behind the residential lot). She lived there until 2002, when she bought and moved into 243 Promenade Avenue. Mrs. Freeman testified that she was aware the BBA owned some community property in the neighborhood, such as the tennis courts, a chapel, a baseball field, a community center building, and a beach area at the end of Buttonwoods Avenue. She also testified that she hired a landscaping company to maintain both the residential lot and the waterfront lot. She was not aware of any BBA policy that required the owner of 243 Promenade Avenue to get permission from the BBA before doing work on the property. She testified that she had a tree cut down that had been on the disputed part of the residential lot without asking for permission from the BBA.

When Mrs. Freeman listed 243 Promenade Avenue for sale on the Multiple Listing Service, she included a photo of the waterfront lot because she believed she owned that property and was selling it along with the residential lot part of 243 Promenade Avenue. She testified that she had never seen a survey of the property. She stated that she had allowed neighbors and strangers to watch fireworks from the waterfront lot on the Fourth of July. She also testified, however, that when she lived on Cooper Avenue, before she bought 243 Promenade Avenue, she always asked permission from Hurley or the Zigerellis before she used the beach.

Edward Freeman testified that, although he frequently fished off the seawall before he owned 243 Promenade Avenue, he was never sure whether he needed to ask permission each time he went to the wall. When presented at trial with an affidavit in which he disavowed ownership of the waterfront lot that he had signed in 2013 at the behest of Romolo Marsella, who was a Buttonwoods resident and former BBA president, Mr. Freeman testified that he had signed the affidavit "hastily" and had not actually agreed with some of the statements made in the document.

Judith Clark (the current owner and plaintiff) testified that, when she first saw the property, she asked the Freemans about the waterfront lot and asked the realtor if it was included because she wanted to purchase the property only if the waterfront lot was included. For the first two years she owned 243 Promenade Avenue, she maintained the waterfront lot without any interference from the BBA. Mrs. Clark did not know about the BBA when she bought the property and testified that she went to her first annual BBA meeting a year after purchasing the property. At one point, she removed the daylilies that Nancy Zigerelli had planted from the waterfront lot and sent an email to the whole neighborhood asking if anyone wanted them; no one mentioned that she was supposed to ask for permission from the BBA before making any changes to the landscaping of the waterfront lot or that this lot was not part of her property.

In 2011, after Susan Phipps (then president of the BBA) ordered Mrs. Clark to remove the "no trespassing/private property" signs because the property on which Mrs. Clark had posted the signs belonged to the BBA, Mrs. Clark commissioned a survey of the property. The survey revealed that the Clarks did not own the entire waterfront lot. After getting the survey and learning that she had not bought the precise property she thought she had bought, Mrs. Clark testified, she kept the no-trespassing signs up because she was protecting what she continued to believe she had purchased.

Harry Miller, a licensed land surveyor, performed the survey of 243 Promenade Avenue in June 2011 that Mrs. Clark requested. Miller testified that he used the recorded 1882 plat map as the baseline from which he began the survey process. Using granite markers and iron rods that existed around the property as well as information from an 1882 map recorded when the Buttonwoods neighborhood was created, Miller determined the mathematic location of the eighty-foot-wide strip of land purporting to be Promenade Avenue. The survey showed that this eighty-foot public width included some of the front yard of the residential lot, the entire front hedge, and the concrete sidewalk. On the waterfront lot, the survey showed that the eighty-foot public width included the hedge and the grassy area, but ended before the concrete patio. Miller further testified that there was no way a layperson would have been able to accurately determine the location of this eighty-foot width using visual markers or cues at the physical property; the boundary lines on his survey had been generated by AutoCAD, a software program for surveyors. Miller also performed a second survey at the Clarks' request to "identify any features that were being used within the eighty-foot right-of-way" along Promenade Avenue between the cross streets of Cooper Avenue and Amore Road. The survey identified that several properties along Promenade Avenue

had man-made features such as hedges and walkways that were placed within the eighty-foot right-of-way.

Susan Phipps, a licensed real estate agent and a licensed appraiser, testified that she had lived in Buttonwoods since 1985 and had been BBA president from 2011 until 2015. Mrs. Phipps testified that former 243 Promenade Avenue owner Mrs. Zigerelli had been a "very good friend" whom she saw on an almost weekly basis. Mrs. Phipps' husband, Ronald, was the real estate agent who brokered the sale of 243 Promenade Avenue several times between the owners and sellers who testified at trial. Mr. Phipps recalled during his trial testimony that Mr. Zigerelli had specifically asked about the property lines and that Mr. Phipps told him approximately where the lines fell.

Peter Dorsey, who had lived in Buttonwoods since 1994, had been on the board of the BBA since approximately 2010 and was the president of the BBA at the time of his trial testimony. He testified that homeowners who wanted to make changes or improvements to the BBA's common areas had to secure permission from the BBA before the improvements were undertaken. Dorsey also testified that there was no record that this rule was ever followed with respect to 243 Promenade Avenue; the BBA did not have a record of any communication the BBA made or received with respect to the waterfront lot at 243 Promenade Avenue between 1986 and the time of trial, despite having many records of communications regarding other common areas during this time period.[7]

Romolo Marsella was a real estate developer who, at the time of trial, had lived in Buttonwoods for forty years. He testified that he served on the BFD for three years in the early

---

[7] The defendant presented the court with several letters from Buttonwoods residents to the BBA requesting permission to make various improvements on their respective properties as well as on the common areas adjacent to their properties.

1980s and had been president of the BBA from 1995 to 2003. He also testified that, once a year at the BFD's annual meeting, a report from the BBA would be read to all those in attendance about the platted streets. He testified that it was important for the BBA and BFD to have control over the full platted width of Promenade Avenue because hurricanes and other storms had eroded the road over time and they needed to be able to make the repairs when necessary. Marsella also testified about communications he had had with residents who asked permission to make improvements to portions of BBA property, but none of these communications had included Weichers, Hurley, the Zigerellis, the Freemans, or the Clarks.

Mark McKenney, another longtime resident of Buttonwoods, was a BFD supervisor for three years in the late 1980s and BBA president from 2003 to 2006. McKenney testified that the BBA sent a letter to all the residents in 2001 essentially advising that each owner "take a good look at [their] property because it may not be what you [thought] [wa]s yours." According to McKenney, "over the years [it had become] common knowledge, certainly anyone who looked into it in Buttonwoods, knew that very often, they didn't own, for example, their front lawn."

In August 2017, the trial justice issued a decision concluding that the Clarks had failed to establish the required elements of adverse possession and acquiescence. Final judgment entered on September 29, 2017, and the Clarks timely filed a notice of appeal.

## II

### Standard of Review

"It is well settled that this Court will not disturb the findings of a trial justice sitting without a jury unless such findings are clearly erroneous or unless the trial justice misconceived or overlooked material evidence." *Quillen v. Macera*, 160 A.3d 1006, 1010 (R.I. 2017) (brackets and deletion omitted) (quoting *Gregoire v. Baird Properties, LLC*, 138 A.3d 182, 191 (R.I. 2016)).

"[W]e accord great weight to a trial justice's determinations of credibility, which, inherently, are the functions of the trial court and not the functions of the appellate court." *Id.* (quoting *Gregoire*, 138 A.3d at 191). "When the record indicates that competent evidence supports the trial justice's findings, we shall not substitute our view of the evidence for his or hers even though a contrary conclusion could have been reached." *Id.* (brackets omitted) (quoting *Gregoire*, 138 A.3d at 191). "We will, however, review questions of law *de novo*." *Id.* (quoting *Gregoire*, 138 A.3d at 192).

## III

## Discussion

It is well settled in our state that land may be acquired through the doctrine of adverse possession when the elements identified in the General Assembly's codification of this method of acquisition are met.[8] General Laws 1956 § 34-7-1 states:

> "Where any person or persons, or others from whom he, she, or they derive their title, either by themselves, tenants or lessees, shall have been for the space of ten (10) years in the uninterrupted, quiet, peaceful and actual seisin and possession of any lands, tenements or hereditaments for and during that time, claiming the same as his, her or their proper, sole and rightful estate in fee simple, the actual seisin and possession shall be allowed to give and make a good and rightful title to the person or persons, their heirs and assigns forever; and any plaintiff suing for the recovery of any such lands may rely upon the possession as conclusive title thereto, and this chapter being pleaded in bar to any action that shall be brought for the lands, tenements or hereditaments, and the actual seisin and possession being duly proved, shall be allowed to be good, valid and effectual in law for barring the action."

"[T]o obtain property by adverse possession, [therefore,] a claimant must prove 'actual, open, notorious, hostile, continuous, and exclusive use of [said] property under a claim of right for at

---

[8] We have previously raised our collective eyebrow at the "ancient roots and arcane rationale of adverse possession[.]" *Cahill v. Morrow*, 11 A.3d 82, 88 (R.I. 2011). We refer any reader interested in the history of this doctrine to *Cahill* for the details of the origin and development of adverse possession. *See id.* at 86-88; *see also id.* at 95 (Flaherty, J., dissenting).

least a period of ten years.'" *DiPippo v. Sperling*, 63 A.3d 503, 508 (R.I. 2013) (footnote omitted) (quoting *Cahill v. Morrow*, 11 A.3d 82, 88 (R.I. 2011)). "The party who asserts that adverse possession has occurred must establish the required elements by strict proof, that is, proof by clear and convincing evidence." *Id.* (quoting *Cahill*, 11 A.3d at 88). "[U]pon ten years of 'uninterrupted, quiet, peaceful and actual seisin and possession' of the land, 'good and rightful title' vests immediately in the adverse claimant." *Carnevale v. Dupee*, 783 A.2d 404, 412 (R.I. 2001) (*Carnevale I*) (quoting § 34-7-1). There are three ways by which a record owner can interrupt a claimant's attempt to obtain property by adverse possession: (1) file an action to quiet title; (2) file a notice of intent to dispute adverse possession pursuant to § 34-7-6; or (3) physically oust the claimant or substantially interrupt the claimant's possession of the property. *Id.* at 409-10.

The "open" and "notorious" elements are considered together; the Court inquires "whether the party claiming ownership by adverse possession used the property in a manner consistent with how owners of similar property would use such land and whether these uses [were] inclined to attract attention sufficient to place the world on constructive notice." *Caluori v. Dexter Credit Union*, 79 A.3d 823, 830 (R.I. 2013) (quoting *Carnevale v. Dupee*, 853 A.2d 1197, 1201 (R.I. 2004) (*Carnevale II*)). "We previously have made clear that 'no particular act to establish an intention to claim ownership is required to give notice to the world of the claim,' and that 'it is sufficient for the claimant to go upon the disputed land and use it adversely to the true owner.'" *McGarry v. Coletti*, 33 A.3d 140, 145 (R.I. 2011) (brackets omitted) (quoting *Lee v. Raymond*, 456 A.2d 1179, 1183 (R.I. 1983)). These elements have been satisfied by an adverse claimant cutting the lawn and generally maintaining the property. *See McGarry*, 33 A.3d at 146; *Carnevale II*, 853 A.2d at 1201.

"To require adverse possession under a claim of right is the same as requiring hostility, in that both terms simply indicate that the claimant is holding the property with an intent that is adverse to the interests of the true owner." *DiPippo*, 63 A.3d at 508 (brackets omitted) (quoting *Tavares v. Beck*, 814 A.2d 346, 351 (R.I. 2003)). "A possessor's use is hostile if it is 'a use inconsistent with the right of the owner, without permission asked or given, such as would entitle the owner to a cause of action against the intruder for trespass.'" *Id.* (brackets and deletion omitted) (quoting *Tavares*, 814 A.2d at 351). Asking for—and receiving—permission to place personal property on the land in question has been deemed an acknowledgment of superior title by another. *Id.* at 509. With respect to exclusivity, however, we have previously stated that, "in order for a defendant to successfully defend against an adverse possession claim of disputed land, 'there would have to be evidence indicating that the defendants or others had made improvements to the land or, at the very least, had used the land in a more significant fashion than merely walking across it.'" *Anthony v. Searle*, 681 A.2d 892, 898 (R.I. 1996) (quoting *Gammons v. Caswell*, 447 A.2d 361, 368 (R.I. 1982)).

In the trial justice's written decision, he began his analysis of plaintiffs' claim for adverse possession by stating express conclusions regarding some of the witnesses' credibility. The trial justice found Mr. Freeman's testimony, contradicting the facts to which he had attested in his affidavit, to be not credible. The trial justice also found Mr. Zigerelli's testimony not credible because he "kn[ew] the [BBA] well" and he "limited his recollection" of some details during cross-examination. Finally, the trial justice questioned the credibility of Mrs. Clark's testimony that she had not known the BBA owned portions of the lots because she admitted to attending the BBA's annual meeting in 2010 when, other witnesses testified, the BBA described some of the property boundaries.

To address the Clarks' claim for adverse possession, the trial justice examined two ten-year time periods of ownership of the disputed property: April 20, 2002, to April 20, 2012 (the latter being the date the BBA filed a notice of interruption in the land evidence records of Warwick), and 1986 to 1996 (beginning when Weichers bought the property and continuing into Hurley's ownership of 243 Promenade Avenue). With respect to the 2002 through 2012 time period, the trial justice concluded that the Zigerellis' actions improving and maintaining the waterfront lot "were not hostile to the [BBA]'s interest during [the Zigerellis'] ownership of 243 Promenade [Avenue]"; therefore, he found that these actions did not support the Clarks' claim for adverse possession. The trial justice also concluded that the Zigerellis had not claimed ownership of the waterfront lot because they had not represented to the Freemans, who lived behind them until they bought 243 Promenade Avenue, that they owned the waterfront lot. In addition, the trial justice concluded that the Zigerellis' use of the land was not exclusive because they allowed neighbors to use it.

Even if the Clarks had established each element of adverse possession as to the Zigerellis, the trial justice concluded, the Clarks had not established each element as to the Freemans. Specifically, the trial justice concluded that the Clarks' claim failed as to the Freemans on the element of exclusivity, because the evidence at trial showed that the Freemans used the waterfront lot before they owned 243 Promenade Avenue and allowed others to use it after they bought the property.

With respect to the 1986 through 1996 time period, the trial justice concluded that, while the Clarks had established the elements of adverse possession during Weichers' ownership, Hurley's use of the waterfront lot was not hostile to the BBA's ownership interest because Hurley testified that he had allowed anyone who wanted to use the land to enter it, and that he installed

- 14 -

stairs to the beach to make access to the beach easier for everyone. Ultimately, the trial justice concluded that the Clarks had "fall[en] far short" of proving ownership of the disputed property by adverse possession.[9]

On appeal, plaintiffs argue that they own the entire waterfront lot because title to this property vested with Hurley in January 1996 through adverse possession, and Hurley's ownership of the entire waterfront lot was passed to each subsequent owner, without effective interruption from the BBA, alighting with the Clarks in June 2009. The plaintiffs assert that the BBA did not reestablish title through the Zigerellis and the Freemans after Hurley moved out of 243 Promenade Avenue in 1999. According to plaintiffs, the BBA had no knowledge that it owned a portion of the waterfront lot until Miller completed the commissioned survey in 2011. The plaintiffs assert that the BBA clearly knew how to enforce its policies with respect to the common areas (property owned by the BBA but used by Buttonwoods residents with permission), but the BBA's ignorance with respect to the waterfront lot was demonstrated through its inability to produce any records that it had ever enforced these policies with any of the owners of 243 Promenade Avenue, many of whom made obvious improvements to the land. The plaintiffs assert that the trial justice therefore misconceived and misconstrued the evidence before him when he concluded that the previous owners of 243 Promenade Avenue had not met all of the elements of adverse possession.

The BBA, for its part, argues that Hurley, the Zigerellis, and the Clarks all used the disputed portion of the waterfront lot with its permission and that the Clarks' claim of ownership of the entire waterfront lot fails because the Clarks cannot establish the statutorily required ten years of

---

[9] The trial justice addressed plaintiffs' claim of ownership by acquiescence in his decision, but plaintiffs have not set forth any arguments specific to this claim in their brief on appeal. We will therefore review the trial justice's decision only with respect to plaintiffs' claim for adverse possession.

continuous, hostile, and exclusive use. The BBA also argues that, because Promenade Avenue is a public road, marked as such from at least 1882 and continuously used by the public, none of the owners of 243 Promenade Avenue could have owned the land within the confines of the eighty-foot public width.

As the trial justice found, the BBA filed a notice of interruption in the Warwick Land Evidence Records on April 20, 2012. Therefore, any attempt to claim ownership of the disputed part of the waterfront lot by adverse possession was interrupted on that date. *See Carnevale I*, 783 A.2d at 409. The Clarks argue that periods of possession of their predecessors in title may be tacked on to other predecessors in title. We agree. We have previously stated that § 34-7-1 "creates a period of limitations on actions to quiet title that runs against the record owner of the land. The adverse possessor is under no duty to quiet title by judicial action, nor 'to vigorously assert [their] right at every opportunity.'" *Id.* at 412 (emphasis omitted) (quoting § 34-7-1).

The trial justice's analysis of the actions of each of plaintiffs' four predecessors in title to 243 Promenade Avenue was a fact-intensive exploration. He articulated clear findings of fact and conclusions for each of these predecessors based on the testimony he heard and the exhibits each party filed during the trial. While we are sympathetic to the situation in which the Clarks find themselves, we are constrained by the standard of review dictated by the posture of the Clarks' appeal. As previously stated, we afford substantial deference to the trial justice's findings of fact and credibility determinations that are made after a nonjury trial in an adverse possession case. *See DiPippo*, 63 A.3d at 507.

After carefully reviewing the testimony, exhibits, and plaintiffs' arguments, it is our opinion that the trial justice did not misconceive or misconstrue the evidence introduced during the trial. As the trial justice noted in his decision, the deed to 243 Promenade Avenue refers to the

1882 plat. The eighty-foot public width represented on the 1882 plat is undisputed. Based on the findings of the trial justice, none of which are clearly wrong, there was not a ten-year period of "actual, open, notorious, hostile, continuous, and exclusive use of property under a claim of right" across the four predecessors in title to the Clarks. *DiPippo*, 63 A.3d at 508 (quoting *Cahill*, 11 A.3d at 88).

The issue of the exclusivity of each owner's possession of the waterfront lot gave us momentary pause. We have previously held that the defendants "occasionally cross[ing] [the disputed land] in no way interrupted the continuous and exclusive nature of [the plaintiffs'] claim" for adverse possession. *Gammons*, 447 A.2d at 368. In the case at bar, there was some testimony that the neighborhood's residents had, at the least, crossed over the disputed portion of the waterfront lot to reach the waterfront for fishing and, at the most, used the waterfront lot to watch fireworks on the Fourth of July. In our opinion, and pursuant to our settled common law, these occasional and permissive uses were not sufficient to disturb plaintiffs' exclusive possession of the waterfront lot.

However, as the trial justice concluded, Hurley's possession of the entire waterfront lot was not hostile because he testified that he had installed steps leading to the beach so that others would have easier access to the beach. Mrs. Zigerelli, who owned the property after Hurley, testified that she knew that she needed BBA permission prior to making improvements to the waterfront lot and indeed obtained permission before making any improvements. After according these findings the level of deference they are due, and mindful that we may "not substitute our view of the evidence" even when we might have drawn different conclusions from the same evidence, *Quillen*, 160 A.3d at 1010 (quoting *Gregoire*, 138 A.3d at 191), there is simply no ten-year period of time across the four predecessors in title to the Clarks in which all of the required

- 17 -

elements of adverse possession were met. The trial justice clearly articulated his conclusions with respect to the four predecessors in title on the various elements of adverse possession, and we perceive no error in his ultimate conclusion that plaintiffs had not demonstrated ownership of the entire waterfront lot by adverse possession.

We pause briefly to note, however, that the trial justice did not rule on the plaintiffs' motion to amend their complaint to include the land on the residential lot that falls within the eighty-foot-wide right-of-way as depicted on the 2011 property survey. The true ownership of this part of the residential lot, therefore, has not been settled by this case and, in our opinion, remains an open issue.[10]

## IV

### Conclusion

For the reasons stated herein, the Superior Court judgment is affirmed. The record of this case shall be returned to the Superior Court.

Justice Flaherty did not participate.

---

[10] We also note that, prior to trial, the defendant filed and argued a "Limited Motion for Summary Judgment," contending that "an individual cannot adversely possess property, and in particular a roadway used by the public, controlled by the sovereign." Promenade Avenue is a public roadway, it argued, through the doctrines of incipient dedication and acceptance. *See Newport Realty, Inc. v. Lynch*, 878 A.2d 1021, 1033 (R.I. 2005) (explaining how dedication and acceptance are accomplished by law). The plaintiffs objected to the motion, arguing that Buttonwoods is a "private beach community" and, therefore, Promenade Avenue is not a public way. The trial justice did not reach the issue, neither do we. Nor did the plaintiffs raise a claim to a prescriptive easement in which exclusivity would not be a necessary element. *See Drescher v. Johannessen*, 45 A.3d 1218, 1228 (R.I. 2012) (distinguishing between the elements of adverse possession and easement by prescription).



# STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | David Clark et al. v. Buttonwoods Beach Association. |
| **Case Number** | No. 2018-17-Appeal.<br>(KC 14-271) |
| **Date Opinion Filed** | April 15, 2020 |
| **Justices** | Suttell, C.J., Goldberg, Robinson, and Indeglia, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Kent County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Jeffrey A. Lanphear |
| **Attorney(s) on Appeal** | For Plaintiffs:<br><br>Stephen A. Rodio, Esq.<br><br>For Defendant:<br><br>John P. McCoy, Esq.<br>Todd J. Romano, Esq. |